In re MERRILL LYNCH, PIERCE,
FENNER, AND SMITH, INC.

No. 86–1080.

United States Court of Appeals,
Federal Circuit.

Sept. 17, 1987.

Steven H. Hartman, Milgrim, Thomajan, Jacobs & Lee, New York City, for appellant.

Joseph F. Nakamura, Solicitor, Fred E. McKelvey, Deputy Solicitor and Nancy C. Slutter, Asst. Solicitor, Office of the Solicitor, Arlington, Va., for appellees.

Before SMITH, Circuit Judge, COWEN, Senior Circuit Judge, and NEWMAN, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

The Commissioner of Patents and Trademarks, acting through the Trademark Trial and Appeal Board (Board), refused registration of the term CASH MANAGEMENT ACCOUNT on the Principal Register as a service mark for "stock brokerage services, administration of money market fund services, and providing loans against securities services", Application Serial No. 254,-808. *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 230 USPQ 128 (TTAB 1986).

The Board held that CASH MANAGEMENT ACCOUNT is a common descriptive or generic name for these financial services, such that acquired distinctiveness or secondary meaning can not provide a right to registration, as a matter of law. The Board thus refused registration under 15 U.S.C. § 1052(f). We reverse and remand.

### Incontestability

Appellant already has a registration No. 1,118,929 on the Principal Register, granted May 22, 1979 for the term CASH MANAGEMENT ACCOUNT as a service mark for "financial services involving the use of plastic credit cards by the cardholders for loans to cardholders from their brokerage equity account." This registration is incontestable, in accordance with 15 U.S.C. §§ 1065 and 1115(b). Taking the position that these services are substantially the same as the services for which registration is now sought, appellant argues that "the Board erred as a matter of law in refusing to order registration on the Princi-pal Register of a service mark as to which Appellant owns incontestable rights". Appellant argues that its incontestable right to use the term CASH MANAGEMENT ACCOUNT for the services for which it is registered "perforce includes the right to register that term for these same services in a subsequent application". Appellant asserts that to hold otherwise would deny it title to the mark for the services for which the mark is already registered, citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

The benefits of incontestability are no more than that "the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce". 15 U.S.C. § 1115(b). The only thing that becomes incontestable is the right of the registrant to use the mark for the goods or services for which it is registered. Even that right is subject to the defenses enumerated in 15 U.S.C. § 1115(b) and to the grounds for cancellation set forth at 15 U.S.C. § 1064(c) and (e). *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 320, 189 USPQ 630, 636 (CCPA 1976).

In *Park 'N Fly, Inc.* the Supreme Court held that an action for infringement of a registered mark that has become incontestable can not be defended on the ground that the mark is "merely descriptive". 469 U.S. at 205, 105 S.Ct. at 667. This holding is not pertinent to appellant's argument concerning registration of the same mark for a broadened class of goods. The appellant does not explain how its existing registration for services that require the use of plastic credit cards is substantially the same as the services for which registration is now sought, as those are set forth in the subject application for registration and as quoted by the Board in its opinion at page 130 of 230 USPQ.

While "ownership of one or more prior registrations on the Principal Register ... of the same mark may be accepted as prima facie evidence of distinctiveness," 37 C.F.R. 2.41(b), ownership of a registration does not of itself authorize the grant of

another registration for different goods. Each application for registration must be considered on its own merits. *In re Loew's Theatres, Inc.*, 769 F.2d 764, 769, 226 USPQ 865, 869 (Fed.Cir.1985). Appellant's argument that refusal of a broader registration is comparable to an attack on an existing registration is unsupported by law or precedent.

The Board correctly held that appellant's incontestable registration for specific services involving credit cards does not automatically entitle appellant to a registration for broader financial services.

### Descriptiveness

The Board affirmed the examiner's determination that the term CASH MANAGEMENT ACCOUNT is generic for the services described in the application. The Board considered first whether the term is a common descriptive or generic name for the described services.

Appellant argues that its incontestable registration of the mark for similar services is persuasive evidence of distinctiveness, and also argues that there is no direct evidence that CASH MANAGEMENT ACCOUNT is generic for the services for which registration is sought. From the examiner's evidence of usage in newspapers and financial publications, the Board concluded that "[w]hile there are references to applicant as a pioneer in this type of account", as well as first user of the term to identify such an account, "it appears that said term has been adopted by a major segment of financial business as a name to designate services such as applicant offers." *In re Merrill Lynch*, 230 USPQ at 130.

The four classic categories—generic ("common" descriptive), descriptive ("merely" descriptive), suggestive, or arbitrary—have been described as "central tones in a spectrum", that "tend to merge at their edges and are frequently difficult to apply." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183, 207 USPQ 278, 282 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). Nonetheless, the distinctions are critical to the availability and the evidentiary requirements of registration.

Generic terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status. *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 1014, 202 USPQ 100, 105 (CCPA 1979). The reason is plain:

> To allow trademark protection for generic terms, i.e., names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.

*CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13, 188 USPQ 612, 615 (2d Cir.1975). In contrast, "merely descriptive" terms are capable of acquiring, in the view of the consuming public, an association with the source of the goods or services; that is, a secondary meaning in accord with 15 U.S.C. § 1052(f). *See Roselux Chemical Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 862, 132 USPQ 627, 633 (CCPA 1962) ("Distinctiveness means that the *primary* meaning of the word ... is as a designation of source rather than of a characteristic of the product.") (emphasis in original).

Whether a term is classified as "generic" or as "merely descriptive" is not easy to discern when the term sits at the fuzzy boundary between these classifications. *See Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790, 217 USPQ 988, 993 (5th Cir.1983) ("[t]he labels are more advisory than definitional, more like guidelines than pigeonholes"). It is basic to the inquiry to determine whether members of the relevant public primarily use or understand the term to refer to the genus of goods or services. *H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc.*, 782 F.2d 987, 989–90, 228 USPQ 528, 530 (Fed.Cir.1986). As the court said in *In re Automatic Radio Manufacturing Co.*, 404 F.2d 1391, 1396, 160 USPQ 233, 237 (CCPA 1969):

> It seems elementary that one must find out how people in the trade and the pur-

chasers use the terms with respect to the involved goods in order to determine whether or not they are descriptive.

The Board found that the term CASH MANAGEMENT ACCOUNT is generic or commonly descriptive, not "merely descriptive". This finding of fact is reviewed for clear error. *See In re Bed & Breakfast Registry,* 791 F.2d 157, 160, 229 USPQ 818, 819 (Fed.Cir.1986); *In re Northland Aluminum Products, Inc.,* 777 F.2d 1556, 1559, 227 USPQ 961, 963 (Fed.Cir.1985).

■ Evidence of the public's understanding of the term may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications. *In re Northland Aluminum Products,* 777 F.2d at 1559, 227 USPQ at 963; *Dan Robbins & Associates, Inc. v. Questor Corp.,* 599 F.2d at 1014, 202 USPQ at 105; *In re Thunderbird Products Corp.,* 406 F.2d 1389, 1390–91, 160 USPQ 730, 731–32 (CCPA 1969).

Before the Board was voluminous evidence of usage in financial publications of the term, following Merrill Lynch's introduction of the financial system, from which the Board concluded "that said term has been adopted by a major segment of financial business as a name to designate services such as applicant offers." *In re Merrill Lynch,* 230 USPQ at 130. The following is representative:

> American Banker, November 9, 1983: "Banks have also stated that brokerage firms, through cash management accounts, have held an unfair advantage over the banking industry. Nonetheless, with the ability to offer discount brokerage services, banks can offer a cash management account that is every bit equal to that offered by the brokerage firms."
>
> The Christian Science Monitor, February 17, 1984: "It isn't possible, for example, to talk simply about 'savings' and 'checking' as alternate forms of cash management when a wide variety of multipurpose accounts now exists. It's almost impossible to differentiate between stockbrokers and bankers when they are

> equally willing to offer you a checking account...."
>
> United Press International, July 21, 1982: "Although it is a first step toward one-stop investment services, it differs from cash management accounts offered by Merrill Lynch and other brokerages in that Chemical will only execute orders."
>
> The Bond Buyer, July 22, 1982: "[O]ther products ... serve the same full-financial services needs that led to this latest service. The bank is working on a cash management account-type of product which will enfold into it the parts already in motion from the discount broker operation."
>
> Newsweek, July 19, 1982: "The Cash-Management Account (CMA) pioneered by Merrill Lynch and offered by half a dozen brokers, isn't yet particularly profitable."
>
> Business Week, December 26, 1983/January 2, 1984: "[D]rawing boards at Vanguard is a central asset management account, a program that—pioneered by Merrill Lynch's Cash Management Account and copied throughout the industry—has become a linchpin of the 'financial supermarket' concept."
>
> American Banker, November 4, 1983: "The bank also offers customers an asset management account, dubbed Focus, that competes with the highly successful Cash Management Account pioneered by Merrill Lynch & Co."

Appellant points out that no publication or usage of the term cited by the Board or the Examiner appeared before Merrill Lynch's introduction of the term for use with specific brokerage services, and argues that those publications that appear to use the term in a descriptive sense do not describe the precise services for which registration is sought. The Board held that the absence of descriptive details was not controlling "since there is no question that they refer to financial services of the same general nature as [appellant's]." *In re Merrill Lynch,* 230 USPQ at 130–31. The issue, however, is how the consuming public views the mark.

The burden of showing that a proposed mark is generic remains with the Patent and Trademark Office. The Trademark Manual of Examining Procedure 1305.04 (1974, rev. 1983) requires that the "substantial showing by the Examining Attorney that the matter is in fact generic ... must be based on clear evidence of generic use". The mixture of usages unearthed by the NEXIS computerized retrieval service [1] does not show, by clear evidence, that the financial community views and uses the term CASH MANAGEMENT ACCOUNT as a generic, common descriptive term for the brokerage services to which Merrill Lynch first applied the term.

The evidence before the Board showed recognition in a substantial number of publications that the source of the CASH MANAGEMENT ACCOUNT was the appellant. This evidence does not clearly place appellant's mark in the category of a generic or common descriptive term. As Judge Rich explained in *In re Abcor Development Corp.*, 588 F.2d 811, 816, 200 USPQ 215, 219 (CCPA 1978) (Rich, J., concurring) (emphasis in original), a term that immediately and unequivocally describes the purpose and function of appellant's goods is a name for those goods, for "[t]hat is what *names* do. They tell you what the thing *is*." The term CASH MANAGEMENT ACCOUNT was not shown to meet this standard. Accordingly, because the Patent and Trademark Office failed to sustain its burden of showing that appellant's proposed trademark is generic, we hold that the factual determination by the Board, finding that the term CASH MANAGEMENT ACCOUNT as used by appellant is generic, is clearly erroneous.

The term thus must be considered in the category of "merely descriptive". A "merely descriptive" term requires the Board to take cognizance of appellant's evidence of secondary meaning. "[E]very mark sought to be registered by taking advantage of § 2(f) involves descriptiveness to some degree." *In re Ideal Indus-*

*tries, Inc.*, 508 F.2d 1336, 1339, 184 USPQ 487, 489 (CCPA 1975). It is incumbent on the Board to balance the evidence of public understanding of the mark against the degree of descriptiveness encumbering the mark, and to resolve reasonable doubt in favor of the applicant, in accordance with practice and precedent. *See In re Aid Laboratories, Inc.*, 221 USPQ 1215, 1216 (TTAB 1983) (in deciding whether PEST PRUF for animal shampoo with insecticide is suggestive or merely descriptive, doubt is resolved in favor of applicant in holding the term merely suggestive of a possible end result of the use of applicant's goods); *In re Gourmet Bakers, Inc.*, 173 USPQ 565 (TTAB 1972) (any doubt in determining the registrability of THE LONG ONE for bread is resolved in favor of applicant "on the theory that any person who believes that he would be damaged by the registration will have an opportunity ... to oppose the registration of the mark and to present evidence, usually not present in the ex parte application, to that effect.")

On this basis, we reverse the Board's decision that the term CASH MANAGEMENT ACCOUNT is generic. Although the Board stated that "there is no question that applicant has gathered a substantial and comprehensive showing of evidence of distinctiveness", *In re Merrill Lynch*, 230 USPQ at 131, the Board offered no conclusion on the adequacy of the showing under section 2(f). We remand for this purpose.

REVERSED AND REMANDED.

---

1. As observed in *In re Societe Generale Des Eaux Minerales De Vittel S.A.*, 824 F.2d 957, 958, 3 USPQ2d 1450, 1451, (Fed.Cir.1987), "[i]t is indeed remarkable to see the thoroughness with which NEXIS can regurgitate a [term] casually mentioned in the news."