THIS DECISION IS CITABLE
AS PRECEDENT OF THE
TTAB

Mailed: 9/8/2004

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————

**Trademark Trial and Appeal Board**

———————

In re Candy Bouquet International, Inc.

———————

Serial No. 78058216

———————

John E. Pruniski, III of Hilburn, Calhoon, Harper, Pruniski & Calhoun for applicant.

Caroline E. Wood, Trademark Examining Attorney, Law Office 110 (Chris A.F. Pedersen, Managing Attorney).

———————

Before Seeherman, Quinn and Holtzman, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

An application was filed by Candy Bouquet International, Inc. to register the mark CANDY BOUQUET ("CANDY" disclaimed) for "retail, mail, and computer order services in the field of gift packages of candy."[1] Applicant has claimed that its mark has acquired distinctiveness under Section 2(f) of the Trademark Act.

The trademark examining attorney refused registration

———————

[1] Application Serial No. 78058216, filed April 12, 2001, alleging first use anywhere and first use in commerce on January 1, 1989.

under Section 2(e)(1) of the Act on the ground that the proposed mark, when used in connection with applicant's services, is generic and, thus, incapable of functioning as a source-identifying mark. The examining attorney further contends that even if the term CANDY BOUQUET is found to be not generic, but rather merely descriptive, then the evidence of acquired distinctiveness is insufficient to support registration on the Principal Register.

When the refusal was made final, applicant appealed. Applicant and the examining attorney submitted briefs. An oral hearing was not requested.

The examining attorney maintains that the term sought to be registered is a generic name for a central characteristic of applicant's services recited as "retail, mail, and computer order services in the field of gift packages of candy." According to the examining attorney, gift packages of candy, which essentially are candy items arranged in the manner of a floral bouquet, are known as "candy bouquets." The examining attorney takes the position that no amount of Section 2(f) evidence would be persuasive of registration of the proposed mark. In the event that it is determined that the term is not generic but rather just merely descriptive, the examining attorney contends that the evidence of acquired distinctiveness is

insufficient to permit registration on the Principal

Register. The examining attorney addressed each of the

items introduced in support of the Section 2(f) claim,

including applicant's previously issued registration, but

found that the evidence is not persuasive. In support of

her genericness refusal, the examining attorney submitted

excerpts of articles retrieved from the NEXIS database and

portions of web pages taken from the Internet.[2]

Applicant contends that the mark it seeks to register,

CANDY BOUQUET, is not generic as used in connection with

its services. While conceding that the mark is merely

descriptive, applicant asserts that it has submitted

sufficient evidence to show that the mark has acquired

distinctiveness under Section 2(f). In support of its

claim that the mark has acquired distinctiveness, applicant

relies on its use of the term CANDY BOUQUET since 1989, and

its ownership of a previously issued registration of a mark

---

[2] In this application, the Office granted a letter of protest. The purpose of a letter of protest is to permit third parties to bring facts relevant to the registrability of the mark to the attention of the Office. The Office will grant a letter of protest only if the protestor submits *prima facie* evidence supporting a refusal of registration, such that publication of the mark without consideration of the issue and evidence presented in the letter of protest was or would be a clear error by the Office. Trademark Manual of Examining Procedure (TMEP) §1715 (3d ed. rev. May 2003). In accordance with standard procedure, the factual evidence filed with the letter of protest was forwarded to the examining attorney who, in turn, relied on the evidence in support of the refusal.

which includes the term CANDY BOUQUET. Applicant also introduced a summary of advertising expenditures compiled by applicant's accountant; an auditor's report showing sales figures for the years 1999-2001; and excerpts from articles appearing in printed publications. Also of record are three letters from individuals, all of whom have a business relationship with applicant.

The issues on appeal are whether the term CANDY BOUQUET is generic for applicant's retail, mail, and computer order services in the field of gift packages of candy and, alternatively, if such term is not generic but rather just merely descriptive, whether it has acquired distinctiveness. As indicated earlier, applicant has conceded the mere descriptiveness of the term sought to be registered, both in its response (filed January 31, 2003)[3] and by its seeking registration pursuant to Section 2(f) in the original application. In essence, applicant's Section 2(f) claim of acquired distinctiveness is a concession that the mark is not inherently distinctive and that it therefore is not registrable on the Principal Register absent a sufficient showing of acquired distinctiveness.

---

[3] Applicant stated the following: "Applicant agrees that the Mark is descriptive under Section 2(e)(1). However, the applicant submits herewith proof that the Mark has become distinctive of the applicant's goods [sic--services] in commerce as set forth in Section 2(f)."

See Yamaha International Corp. v. Hoshino Gakki Co. Ltd., 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) ["Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the *statute* accepts a lack of inherent distinctiveness as an established fact."] (emphasis in original); and In re Leatherman Tool Group, Inc., 32 USPQ2d 1443 (TTAB 1994). Thus, the issue of mere descriptiveness is not an issue in this appeal.

## Genericness

We first turn to the issue of whether the term CANDY BOUQUET is generic when used in connection with services involving gift packages of candy. A mark is a generic name if it refers to the class or category of goods and/or services on or in connection with which it is used. In re Dial-A-Mattress Operating Corp., 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001), citing H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986). The test for determining whether a mark is generic is its primary significance to the relevant public. Section 14(3) of the Trademak Act; In re American Fertility Society, 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); Magic Wand Inc. v. RDB Inc., 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991);

5

and H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc., <u>supra</u>. The United States Patent and Trademark Office has the burden of establishing by clear evidence that a mark is generic and thus unregistrable. In re Merrill Lynch, Pierce, Fenner and Smith, Inc., 828 F.2d 1567, 4 USPQ2d 1141 (Fed. Cir. 1987). Evidence of the relevant public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers, and other publications. In re Northland Aluminum Products, Inc., 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985).

Our first task under <u>Marvin Ginn</u> is to determine, based on the evidence of record, the genus of applicant's services. In its application, applicant identified the services as "retail, mail and computer order services in the field of gift packages of candy." The evidence shows that applicant markets a particular type of "gift packages of candy." An advertisement for franchisee opportunities with applicant describes applicant's products as "floral-type designer gift arrangements of candies and chocolates." Indeed, photographs of applicant's gift packages of candy show that these arrangements also may include cut flowers and greens. Therefore, we find that the genus of services involved in this case may be more specifically defined as

"retail, mail and computer order services in the field of floral-type designer gift arrangements of candies and chocolates."[4]

We next must determine whether the term applicant seeks to register, CANDY BOUQUET, is understood by the relevant public primarily to refer to that genus of services. The examining attorney has made of record excerpts of articles obtained from the NEXIS database which identify "candy bouquet" as a type or category of a gift package of candy. A search of "candy bouquet" revealed 134 stories, of which the following are a representative sample:

> Often when lawmakers arrive at their desks in the House and Senate, they find a gift waiting for them. Nothing extravagant--perhaps a fancy pen, coffee mug, stick note dispenser, candy bouquet, lapel pin or snack.
> (*Bismarck Tribune*, March 23, 2003)
>
> Foley specializes in cookies, cakes, cookie bouquets, candy bouquets and decorated cakes and cookies.
> (*Tulsa World*, March 12, 2003)
>
> During the first week of February, the senior class sold candy bouquets, red roses, and singing telegrams to students in grades seven through 12.
> (*Times-Picayune*, February 23, 2003)

---

[4] It hardly need be stated that gift packages of candy come in a myriad of styles and forms, many of which are not packaged in the manner of floral-type designer gift arrangements of candies and chocolates.

Candy Expressions, a Pembroke Pines store that sells candy bouquets customized for many different occasions, went into business five years ago, during booming economic times.
(*Sun-Sentinel*, November 11, 2002)

She said men often balk at receiving fresh flowers as a gift but a candy bouquet can have a masculine flair.
(*Orlando Sentinel*, October 17, 2002)

The store handles floral needs for wedding [sic], funerals and special events.  It also specializes in candy bouquets, fruit baskets, and arrangements of silk and fresh flowers.
(*Daily Town Talk*, September 2, 2002)

Kozlowski, who began her home-based business, Wrapper Creations, two years ago, also creates designs with catchy phrases and endearing sentiments for gum wrappers, candles, candy bouquets, wine and beer bottles, and greeting tubes.  Greeting tubes?
(*Plain Dealer*, July 14, 2002)

Burglars who hit a florist and gift shop in Lincoln, Neb., took 400 roses and 100 stuffed animals and dallied long enough to rip all of the chocolate out of the candy bouquets.
(*The Seattle Times*, April 27, 2002)

In February, Hartze introduced candy bouquets--bouquets of "flowers" made out of candy arranged in a flower pot. Some are pre-made, but she also takes orders for specific kinds of candy. The bouquets are good for any occasion, form Easter to birthdays, she said.
(*American Aberdeen News*, March 24, 2002)

Youths and adults will design, make and take home their own candy bouquet. Instructor Louise Butera will teach basic wiring, taping and arrangement design.
(*Times-Picayune*, February 17, 2002)

Forcier continues to sell her balloons from the store along with candy bouquets....
(*St. Petersburg Times*, November 19, 2001)

They feature Telefloral wire service and also have a variety of green plants, balloons, candy bouquets and gifts.
(*St. Louis Post-Dispatch*, February 15, 2001)

Della Mosley of Rockford opted instead for a candy bouquet for her sweetie.
(*Rockford Register Star*, February 14, 2001)

Dotolo said that once customers find her shop, they find something they like.  It features specialized candy bouquets and personalized hand-painted gifts.
(*St. Petersburg Times*, January 26, 2001)

I recently finished making a pretty candy bouquet with my aunt.
(*Los Angeles Times*, August 24, 2000)

The company specializes in candy bouquets, miscellaneous novelty candies and vanilla candy-coated dog biscuits.
(*Telegraph Herald*, April 23, 2000)

CANDY BOUQUETS & CUPCAKES Hands-on class in decorating basics and candy bouquets (candy "kit" included).
(*The Dallas Morning News*, January 12, 2000)

Sugar-free candy bouquets are available, too.
(*Star Tribune*, February 5, 1998)

Their learning-disabled students created candy bouquets and sold them at school.
(*St. Petersburg Times*, July 14, 1999)

The business specializes in gourmet baskets and candy bouquets.
(*Tulsa World*, December 30, 1998)

From her Bel Air Plaza store at 120th and West Center Road, Belmont creates candy "bouquets" from brand-name sweets and gourmet or novelty chocolates.
(*Omaha World Herald*, November 26, 1998)

Krepshaw can create a colorful candy bouquet for any holiday or special occasion.
(*Charleston Gazette*, April 30, 1997)

Learn how to make cookie and candy bouquets.
(*The Dallas Morning News*, January 22, 1997)

Sweetheart Crafts and Floral, a Salt Lake City company that makes candy bouquets and floral arrangements.
(*Salt Lake Tribune*, February 5, 1997)

The business offers a variety of candy bouquets.
(*Bismarck Tribune*, December 15, 1996)

The shop makes and delivers candy bouquets for promotions, birthdays, anniversaries and other special occasions.
(*Orlando Sentinel*, August 25, 1996)

According to Hartley, the specialty of the Sugar Shack is candy bouquets.  She

> describes them as being various candies
> wrapped in colored cellophane and made
> into a bouquet. She also makes
> bouquets with chocolate roses wrapped
> in foil and arranges them with green
> silk and more colored cellophane.
> (*Dayton Daily News*, February 1, 1995)
>
> Moran said she borrowed the idea from a
> friend in Jackson, Miss., who does
> similar types of candy bouquets by
> using unique hard candies from around
> the world that will last about a year
> if they are left wrapped at room
> temperature.
> (*The Advocate*, September 8, 1994)
>
> His 18-month-old company, Creations by
> Alejx, named after his daughter, makes
> candy bouquets--edible arrangements.
> (*Orlando Sentinel*, May 13, 1994)

The examining attorney also introduced an Internet web page retrieved at www.crazybouquet.com showing that an entity named "CrazyBouquet.com" "has a large selection of special occasion candy bouquets," with the merchant's urging that "[w]hen flowers aren't special enough, send the candy bouquet that is guaranteed to please. Choose your favorite bouquet and select the occasion." The web page states "Don't miss out on upcoming Valentine's candy bouquets available soon at Crazy Bouquet." The web page has a search function for a "Candy bouquet search" and also allows visitors to the site to provide their e-mail addresses to "Receive monthly candy bouquet specials."

Another website, www.lovemybasket.com, lists items such as picnic baskets, fresh fruit, baby gifts and "candy bouquets." At www.sweetflorals.com, there are "Over 100 Candy Bouquets Available!" The website of www.bloominsweets.com lists, among several items for sale, "candy bouquets": "Candy bouquets and cookie bouquets you can ship anywhere in the World!" Another entity, AC Bouquets, has a web site at www.acbouquet.com, the home page of which is of record. The site lists "Candy Bouquets" along with "Gifts" and "Gift Baskets." This entity markets its products as follows:

> Forget Flowers! Flowers die. Give
> your family, friends, co-workers, and
> clients a gift that will truly knock
> their socks off!! Give them one of our
> completely original candy bouquets,
> edible gifts, or gift baskets. At AC
> Bouquet you get candy. Lots and lots
> of CANDY!! And the men love these
> bouquets just as much as the women!

Visitors to the site can furnish their email addresses if "you want to be contacted when we introduce a new candy bouquet or gift basket." Another page at this site is headlined "Candy Bouquets List," setting forth "links to all of our candy bouquets currently available." This page indicates that "[t]he candy bouquets are split up by category," and that "if there is a category you want to see, but we don't have, please contact us! We're always

looking for a great excuse to think of creative new candy bouquet ideas."  Some of the categories listed are "Any Occasion," "Birthday," "Romantic" and "Thank You."  Lastly, candycrate.com, an entity listed at www.store.yahoo.com, specializes in "Candy Bouquets" and "Nostalgic Candy," further touting that it carries "Affordable Candy Bouquets."

As pointed out by applicant, some of the references to "Candy Bouquet" in the NEXIS articles are to applicant and/or applicant's franchisees (applicant counts 33 examples out of the 134 hits), and another two articles do not reference the term "candy bouquet" at all. Nevertheless, these references are outweighed by the clearly generic uses of "candy bouquet" highlighted above. In any event, even in some of the articles which refer to one of applicant's franchisees, the term "candy bouquet" (all small letters, no capitalization) is also used generically to refer to a gift package of candy.  By way of example, the following excerpt is from an article referring to one of applicant's franchisees (franchise store no. 2010):

> The store's candy bouquets are filled
> with chocolates, chocolate truffles and
> candies from all over the world.
> "Every bouquet is done differently,"
> Gonzales said.  "They cost from $7.50

13

> to $50." So far, "women are the
> buyers," Gonzales said. "But we
> definitely know men love candy, too.
> We have bouquets with chocolate cigars
> in them."
> (*Sante Fe New Mexican*, February 11,
> 2003)

And, in another instance, the following story refers to franchise store no. 134:

> "We design and put together candy
> bouquets, and we make a variety of
> gourmet chocolates," says Bonnie
> Vogler, who owns the candy store with
> her daughter, Michele Gratz.
> (*Capital Times*, June 7, 1999)

Based on this evidence, we find that "candy bouquet" is used in a generic manner in the candy industry and among candy sellers to name a floral-type gift arrangement of candies and chocolates. There is a distinct commercial market for "candy bouquets," and applicant is just one of many merchants who sells such gift packages of candy.

The relevant public involved here are ordinary consumers. Given the evidence of widespread use of the term "candy bouquet" in a generic manner to name a type of gift package of candy, it is clear that ordinary consumers would understand the term primarily to refer to a specific type of a gift package of candy.

Inasmuch as applicant is seeking to register a service mark rather than a trademark, an additional principle

14

applicable to our genericness determination in this case is that a term which is generic for a particular class of goods is also deemed to be generic for the services of selling those goods. See, e.g., In re CyberFinancial.Net, Inc., 65 USPQ2d 1789 (TTAB 2002) [BONDS.COM generic for providing information regarding financial products and services on the Internet and providing electronic commerce services on the Internet]; In re A La Vielle Russie Inc., 60 USPQ2d 1895 (TTAB 2001) [RUSSIANART generic for a particular field or type of art and also for dealership services directed to that field]; In re Log Cabin Homes Ltd., 52 USPQ2d 1206 (TTAB 1999) [LOG CABIN HOMES generic for "architectural design of buildings, especially houses, for others," and "retail outlets featuring kits for constructing buildings, especially houses"]; In re Bonni Keller Collections Ltd., 6 USPQ2d 1224 (TTAB 1987) [LA LINGERIE generic for "retail store services in the field of clothing"]; and In re Half Price Books, Records, Magazines, Incorporated, 225 USPQ 219 (TTAB 1984) [HALF PRICE BOOKS RECORDS MAGAZINES generic for "retail book and record store services"]. See also In re Northland Aluminum Products, supra [BUNDT generic of a "ring cake mix" despite fact that evidence showed generic use of term only for a type of cake, and not for a cake mix].

15

Applying this principle to the facts of this case, we find that CANDY BOUQUET is generic as used in connection with applicant's services. The evidence of record, discussed above, clearly shows that "candy bouquet" is a generic name for a certain type of gift package of candy which is sold by applicant and by other merchants.[5] Therefore, in accordance with the authorities cited above, we find that CANDY BOUQUET also is generic for applicant's recited services.

## Acquired Distinctiveness

If applicant's mark is generic, which we have found in this case, then no amount of evidence of acquired distinctiveness can establish that the mark is registrable. In re Northland Aluminum Products, Inc., supra at 964. Even long and successful use of a term does not automatically convert a generic term into a non-generic term. In re Helena Rubinstein, Inc., 410 F.2d 438, 161 USPQ 606, 609 (CCPA 1969). However, for the sake of

---

[5] There is nothing unusual about a product or a service having more than one generic name. Roselux Chemical Co. v. Parsons Ammonia Co., 299 F.2d 855, 132 USPQ 627, 632 (CCPA 1962) ["Consider, however, that the product commonly known as tooth paste is also commonly known as dentifrice and dental cream. A gravestone is also commonly known as a headstone, a tombstone and a monument."]. See also: In re Sun Oil Co., 426 F.2d 401, 165 USPQ 718, 719 (CCPA 1970) (Rich, J., concurring) ["All of the generic names for a product belong in the public domain."]. (emphasis in original).

completeness, we now address applicant's claim that its mark has acquired distinctiveness. On this issue, applicant has the burden of proving that its mark has acquired distinctiveness. In re Hollywood Brands, Inc., 214 F.2d 139, 102 USPQ 294, 295 (CCPA 1954)("[T]here is no doubt that Congress intended that the burden of proof [under Section 2(f)] should rest upon the applicant"). "[L]ogically that standard becomes more difficult as the mark's descriptiveness increases." Yamaha International Corp., supra at 1008. In this case that standard is extremely difficult to meet since, if CANDY BOUQUET is not generic for applicant's services, it must be considered highly descriptive of them.

As noted earlier, in support of its claim of acquired distinctiveness, applicant specifically relies upon the following: use of CANDY BOUQUET for 14 years; ownership of a prior registration; sales and advertising figures; unsolicited articles about applicant in printed publications; ownership of Internet domain names; and letters from three of applicant's vendors.

There is no question that applicant, over a period of 14 years, has enjoyed a degree of business success. Applicant's audited financial statements show total revenues from franchise fees and sales for the three-year

17

period 1999-2001 at approximately $9.9 million. Applicant also submitted a summary of estimated expenditures, furnished by applicant's accountant, related to the promotion of the designation "CANDY BOUQUET." According to Ms. Tonya N. Tennison, CPA, applicant's total advertising expeditures for the years 1993-2001 were approximately $7.4 million. In the three-year period 1999-2001, advertising expenditures were about $428,000.

Also of record is an excerpt from a printed publication, Entrepreneur, which lists applicant as one of the country's "Top 100 Franchises" (Number 90). In addition, applicant has been the subject of at least two cover stories in what appear to be publications in the business franchising industry. Only the covers have been submitted, however, and the articles themselves were not made of record.

This evidence shows only the popularity of applicant's services, not that the relevant customers of such services (namely, ordinary consumers) have come to view the term CANDY BOUQUET as applicant's source-identifying mark. In re Bongrain International Corp., 894 F.2d 1316, 13 USPQ2d 1727 (Fed. Cir. 1990); and In re Recorded Books Inc., 42 USPQ2d 1275 (TTAB 1997). The issue here is the achievement of distinctiveness, and the evidence falls short of

establishing this. While applicant has fairly substantial advertising expenditures, these figures only suggest the efforts made to acquire distinctiveness, and do not demonstrate that the efforts have borne fruit. In re Pennzoil Products Co., 20 USPQ2d 1753 (TTAB 1991). In view of the widespread use of the term "candy bouquet" in connection with the activities of third parties, the sales and advertising by applicant are not sufficient to show that the public associates the term "candy bouquet" with applicant, or recognizes the term as a mark identifying services emanating from applicant.

Applicant also claims ownership of Registration No. 1,862,669 (Section 8 affidavit accepted, Section 15 affidavit acknowledged), for the mark CANDY BOUQUET SINCE 1989 A DELICIOUS ALTERNATIVE TO FLOWERS. The registration issued on November 15, 1994 for goods identified as "individually wrapped candies arranged to simulate a floral bouquet." The mark is shown below.



The registration indicates that the terms "CANDY BOUQUET, SINCE 1989" and the representation of the candy arrangement are disclaimed apart from the mark.

Applicant is correct in stating that ownership of a prior registration on the Principal Register may be accepted as *prima facie* evidence of distinctiveness. Trademark Rule 2.41(b) provides that the examining attorney may accept, as *prima facie* evidence of acquired distinctiveness, ownership by the applicant of one or more prior registrations of the "same mark" on the Principal Register. The rule states that ownership of existing registrations to establish acquired distinctiveness "may" be considered acceptable in "appropriate cases," but that the USPTO may, at its option, require additional evidence of distinctiveness.

Aside from the fact that there are clear differences in the marks, there is an even more significant problem with applicant's reliance on its prior registration. The term "CANDY BOUQUET" in the prior registration has been disclaimed pursuant to Section 6 of the Act. In a trademark application or registration, a disclaimer is a statement that the applicant or registrant does not claim the exclusive right to use a specified element or elements of the mark. TMEP §1213 (3d ed. rev. May 2003). The

20

purpose of a disclaimer is to permit the registration of a mark that is registrable as a whole but contains matter that would not be registrable standing alone, without creating a false impression of the extent of the registrant's right with respect to certain elements in the mark.

The presumption of validity of a registered mark, including the presumption that the mark is distinctive, does not extend to individual components of the registered mark, let alone disclaimed components of the mark. In re Bose Corp., 772 F.2d 866, 1 USPQ2d 1, 7 (Fed. Cir. 1985) [citing In re National Data, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir. 1985) as follows: "The registration affords prima facie rights in the mark *as a whole*, not in any component." (emphasis in original)]. Because "Candy Bouquet" was disclaimed in applicant's prior registration, that registration is not evidence that the USPTO considered this term to be distinctive. Simply put, the prior registration is of no consequence in determining whether CANDY BOUQUET has acquired distinctiveness as a mark.

Applicant also claims that it is the owner of several Internet domain names which incorporate the term "candybouquet." We find that an applicant's mere ownership of an Internet domain name is not persuasive evidence of

21

distinctiveness. See In re CyberFinancial.Net, Inc.,

supra; and In re Martin Container, Inc., 65 USPQ2d 1058

(TTAB 2002) [CONTAINER.COM is generic for retail services

offered on the Internet featuring metal shipping

containers.]. See also In re Oppedahl & Larson LLP, 373

F.3d 1171, 71 USPQ2d 1370 (Fed. Cir. 2004) [PATENTS.COM is

merely descriptive when applied to computer software].

Thus, applicant's ownership of domain names such as

candybouquet.com and candybouquetfranchise.com is of no

help in establishing distinctiveness of the term CANDY

BOUQUET for applicant's identified services.

Applicant further introduced letters it received from

three of its vendors. According to applicant, the letters

add to the weight of the evidence of acquired

distinctiveness.

The first letter reads in its entirety as follows:

> Peerless Confection Company has been
> happy to have Candy Bouquet
> International, Inc. and many of its
> franchisees as customers for over 10
> years. We appreciate your interest in
> our candy as components of your
> attractive bouquet arrangements. Best
> wishes to you on your continued
> success.

The second letter is from one of applicant's former

franchisees who states that she is still affiliated with

applicant in a vendor capacity. She asserts that she

"never referred to Candy Bouquet International or to the product I was creating and selling as anything other than 'Candy Bouquet.'" The letter goes on to state that "[a]ll marketing for these new products has been done through direct mail brochures and on [applicant's] extranet and are always referred to as Candy Bouquet Custom Confections."

The third letter is from one of applicant's suppliers, and reads, in its entirety, as follows:

> Please accept this letter as a statement that Hillside Candy, a supplier, equate [sic] the name 'Candy Bouquet' with [applicant] and we see [applicant] as the only source of candy bouquets. If you need anything further, please feel free to contact me.

The letters are of very little probative value in showing acquired distinctiveness of the term CANDY BOUQUET. The first letter does not even mention the mark applicant seeks to register. Moreover, in the second sentence of this letter, the writer even refers to "bouquet" in a generic manner when referring to applicant's product. Likewise, the second letter does little in establishing that the term CANDY BOUQUET is a source-identifying mark for applicant's services. The third letter, if anything, actually detracts from the distinctiveness claim given the writer's use of "candy bouquets" in a generic manner. We

23

also point out that none of the letters attests to the perception of CANDY BOUQUET by the general public, the ultimate consumers of applicant's services.

In sum, the issue here is the achievement of distinctiveness, and the evidence falls short of establishing this. Applicant's evidence is outweighed by the NEXIS and Internet evidence showing widespread use of the term "candy bouquet" in the trade and among the public at large as a generic name. To be clear on this significant point, we emphasize that the record is completely devoid of *direct* evidence that ordinary consumers view CANDY BOUQUET as a distinctive source indicator for applicant's services.

Accordingly, even if the designation CANDY BOUQUET were found to be not generic, but merely descriptive, given the highly descriptive nature of the designation CANDY BOUQUET, much more evidence (especially in the form of direct evidence from customers) than what applicant has submitted would be necessary to show that the designation has become distinctive of applicant's services. That is to say, the greater the degree of descriptiveness, the greater the evidentiary burden on the applicant to establish acquired distinctiveness. Yamaha International Corp. v.

24

Hoshino Gakki Co., supra; and In re Merrill Lynch, Pierce, Fenner & Smith, Inc., supra.

## Conclusion

Applicant's term CANDY BOUQUET is generic for the services recited in the application but, if the term is ultimately found not generic, applicant has not demonstrated that its proposed mark has acquired distinctiveness.  The term sought to be registered should not be subject to exclusive appropriation, but rather should remain free for others in the industry to use in connection with their similar services and goods.  In re Boston Beer Co. L.P., 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999).

Decision:  The refusal to register is affirmed.