THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
March 30, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Emergency Alert Solutions Group, LLC*

_____

Serial No. 86890565

_____

Eric D. Morehouse of Kenealy Vaidya LLP for Emergency Alert Solutions Group, LLC.

Mark S. Tratos, Trademark Examining Attorney, Law Office 113 (Odette Bonnet, Managing Attorney).

_____

Before Quinn, Masiello, and Lynch, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Emergency Alert Solutions Group, LLC ("Applicant") seeks registration on the Supplemental Register of the proposed mark LOCKDOWN ALARM in standard characters for the services set forth below:[1]

> Training services in the field of school safety, school
> security and crisis preparedness; training services in the

---

[1] Application Serial No. 86890565 was filed on January 28, 2016 under Trademark Act Section 1(b), 15 U.S.C. § 1051(b), based on Applicant's asserted *bona fide* intention to use the mark in commerce. Applicant originally sought registration on the Principal Register. Applicant filed an allegation of use on May 19, 2016, stating May 18, 2016 as the date of first use and first use in commerce; and subsequently amended the application to request registration on the Supplemental Register.

> field of security and crisis preparedness for schools, hospitals, college campuses, malls, public buildings, office buildings, and other commercial buildings, in International Class 41.

The Examining Attorney has refused registration under Section 23 of the Trademark Act, 15 U.S.C. § 1091, on the ground that Applicant's proposed mark is generic and thus incapable of distinguishing the identified services. As an additional ground for refusal of registration, the Examining Attorney asserts that Applicant has not sufficiently responded to requests for information issued under 37 C.F.R. § 2.61(b). When the Examining Attorney made the refusals final, Applicant appealed to this Board. The case is fully briefed.

I.     Refusal under Section 23.

In order to qualify for registration on the Supplemental Register, a proposed mark "must be capable of distinguishing the applicant's goods or services." 15 U.S.C. § 1091(c). Generic terms do not so qualify. "[G]eneric terms by definition are incapable of indicating a unique source." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1267 (Fed. Cir. 2015) (*citing In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987) ("Generic terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status.")). A proposed mark is generic if it refers to the class or category of goods or services on or in connection with which it is used. *In re Dial-A-Mattress Operating Corp.,* 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001) (*citing H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.,* 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986) ("*Marvin Ginn*")). The test for

determining whether a mark is generic is its primary significance to the relevant public. *In re Am. Fertility Soc'y,* 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); *Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991); and *Marvin Ginn, supra.* Making this determination "involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered … understood by the relevant public primarily to refer to that genus of goods or services?" *Marvin Ginn,* 228 USPQ at 530. "A registration is properly refused if the word is the generic name of any of the goods or services for which registration is sought." *In re Cordua Rests., Inc.,* 823 F.3d 594, 118 USPQ2d 1632, 1638 (Fed. Cir. 2016), *quoting* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:57. The Examining Attorney has the burden of establishing by clear evidence that a proposed mark is generic. *In re Merrill Lynch,* 4 USPQ2d at 1141; *In re Am. Fertility Soc'y, supra*; and *Magic Wand, supra.* We consider the proposed mark as a whole. *See Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,* 786 F.3d 960, 114 USPQ2d 1827, 1831 (Fed. Cir. 2015), *citing In re Steelbuilding.com,* 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005).

A.    The genus of Applicant's services.

The identification of services in the application is clear and is a suitable expression of the genus of services at issue. Applicant and the Examining Attorney appear to agree on this point.[2] *See also Magic Wand*, 19 USPQ2d at 1552 ("a proper genericness inquiry focuses on the description of services set forth in the

---

[2] Applicant's brief at 9, 4 TTABVUE 10; Examining Attorney's brief, 7 TTABVUE 6.

[application or] certificate of registration") (citing *Octocom Sys., Inc. v. Houston Computers Servs.* Inc., 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990)).

B.    Public understanding of the term LOCKDOWN ALARM.

We next consider whether LOCKDOWN ALARM would be understood by the relevant public to refer to training services in the field of safety, security, and crisis preparedness for the types of entities identified in the application. The Examining Attorney contends that the relevant public comprises "individuals who use, visit, or attend …, [and] individuals who own or are responsible for the safety of individuals who use, visit, or attend schools, hospitals, college campuses, malls, public building[s], office building[s] and other commercial buildings."[3] Applicant has not argued against this characterization.

The following relevant dictionary definitions are of record:

lockdown:    1.a. A protocol followed in an emergency that involves confining people in a secure place, such as the confinement of prison inmates in cells after a disturbance, or the locking of students and teachers in classrooms after a violent attack.

b. A situation in which this protocol is undertaken.[4]

alarm:    2. A warning of existing or approaching danger: The committee's report issued an alarm about the dangerous condition of the town's buildings.

3. A device that is used to warn of danger by means of a sound or signal: a fire alarm.[5]

---

[3] Examining Attorney's brief, 7 TTABVUE 6-7.

[4] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (Fifth ed. 2016), Office Action of August 8, 2016 at 7.

[5] *Id.* at 6.

On the present record, it is clear that LOCKDOWN ALARM is a recognized term for a type of warning device. The Examining Attorney has made of record a number of news items and web pages from the internet, among which we note the following:

> We are currently looking in to [*sic*] a lockdown alarm in case a crazed axe murder [*sic*] comes on site we need to have a distinct alarm that people wont [*sic*] confuse with the fire alarm and start evacuating.[6]

> I have just had a lockdown alarm installed by our intruder alarm supplier.[7]

> My school just uses the normal bells as a fire alarm (and as the lockdown alarm too).[8]

> It turned out that the school's lockdown alarm system was accidentally activated …[9]

> Adams 12 school district has not yet determined what caused a false lockdown alarm to sound Wednesday at Legacy High School …[10]

> The lockdown alarm will sound when the campus is notified of possible shootings or a dangerous situation occurs in the areas surrounding or on the campus.[11]

> If instructed to lockdown by police, … or the Lockdown Alarm sounds …, your Building Emergency Coordinators … will attempt to lock building exterior doors, if possible & time permits.[12]

> Valley View has begun the process of upgrading security in all of its schools by installing buzzer entry systems,

---

[6] Posting at <edugeek.net>, Office Action of July 8, 2016 at 6.

[7] Posting at <thecaretakers.net>, *id.* at 13.

[8] Reader comment, <broomfieldenterprise.com>, Office Action of August 8, 2016 at 15.

[9] <kttc.com>, *id.* at 11.

[10] <broomfieldenterprise.com>, *id.* at 14.

[11] <uscb.edu>, Office Action of July 8, 2016 at 7.

[12] <linnbenton.edu>, *id.* at 12.

lockdown alarms, Keltron wireless transceiver, intruder lock hardware and external flashing lights.[13]

The new Lockdown Alarm switch from Haes has been developed to assist with the lock down policy of any school, hospital or other public building.[14]

Classchange Timer – A Lesson Bell and Emergency Lockdown Alarm System.[15]

The Lockdown Experts Training can be used with our recommended Lockdown Alarm.[16]

This evidence is sufficient to show that LOCKDOWN ALARM is commonly understood to refer to a type of emergency warning device. However, the question before us is whether LOCKDOWN ALARM refers to a category of training services. Applicant's specimen of use[17] describes Applicant's training program as follows (emphasis added):

Provide a method of communication during emergencies that is easily accessible to potential victim's [*sic*] and immediately notifies building/school occupants as well as law enforcement. Provides schools and businesses with the most reliable and effective method of communication during an emergency, such as an active-shooter event. *Our training covers proper use of the Lockdown Alarm (such as circumstances warranting Lockdown Alarm actuation)* as well as procedures for *effectively responding to the Lockdown Alarm actuation.*

---

[13] <wsd.org>, Office Action of August 8, 2016 at 16.

[14] <haes-systems.com>, *id.* at 17.

[15] <iag.tech>, *id.* at 12.

[16] <lockdownexperts.com>, *id.* at 19, 20. This webpage belongs to Applicant and describes its training services; we acknowledge that any use of LOCKDOWN ALARM in connection with those services would be intended as use of a service mark and not a generic term. However, this advertisement also shows that Applicant has used "Lockdown Alarm" to describe a type of warning device.

[17] Filed May 19, 2016.

Applicant admits in its brief that "part of Applicant's training services relate to 'emergency' alarms and what is the proper response when said alarm is activated."[18] It is clear from the foregoing that Applicant's safety, security, and crisis preparedness training includes two types of training that relate directly to "lockdown alarms": training as to the proper use of a lockdown alarm; and training as to the proper response to the sounding of a lockdown alarm.

The Examining Attorney argues that "LOCKDOWN ALARM identifies a key aspect and component" of Applicant's services and that the public would understand it to refer to "a central focus or key aspect" of the services.[19] Our primary reviewing Court has repeatedly treated the generic name of a "key aspect" of a service as generic also for the service itself. In *In re Cordua Rests., Inc.*, 118 USPQ2d at 1637-8, the Court recounted:

> In *1800Mattress.com*, we affirmed the Board's determination that MATTRESS.COM is generic for "online retail store services in the field of mattresses, beds, and bedding" because the term "mattress" identified a key aspect of such services. In *Hotels.com*, we affirmed the Board's determination that HOTELS.COM is generic for "providing information for others about temporary lodging" and "travel agency services" because the term "hotels" "names a key aspect" of such services. And in *Reed Elsevier*, we affirmed the Board's determination that LAWYERS.COM is generic for "information exchange concerning the law, legal news, and legal services," because "an integral, if not the paramount, aspect of information exchange about legal services as Reed defines it concerns identifying and helping people to select lawyers."

---

[18] Applicant's brief at 8, 4 TTABVUE 9.

[19] Examining Attorney's brief, 7 TTABVUE 9.

*Id.* (citations omitted). The Court cited with approval the Board's decisions in *In re Tires, Tires, Tires, Inc.*, 94 USPQ2d 1153, 1157 (TTAB 2009) and *In re CyberFinancial.Net, Inc.*, 65 USPQ2d 1789, 1791 (TTAB 2002) ("[A] term which is the generic name of a particular category of goods is likewise generic for any services which are directed to or focused on that class of goods.").

It is clear from Applicant's specimen of use that LOCKDOWN ALARM identifies (at least in part) the subject matter of the services, because the training program covers how to properly use a lockdown alarm and how to properly respond to the activation of such an alarm. Applicant argues that this does not constitute a key aspect or central focus of its services:

> Applicant's training services cover a wide range of concerns in dealing with potential and actual active shooter crises, which includes (but is not limited to); assessing current security protocol and identifying weaknesses; assessing vulnerability and improving security; securing perimeters; identifying threats; conducting drills; delegating responsibility to personnel during a crisis (and training that personnel to make life-saving decisions under immense pressure); responding to an actual crisis; crisis management; evacuation; securing a safe location; communicating with first-responders; and developing an overall crisis preparedness protocol. *Training on how to respond to an active shooter alarm* (even assuming "lockdown alarm" is the generic designation for such alarms) *is certainly part of the Applicant's training services*, but it is by no means the "central focus" or "key aspect" of the Applicant's training services. (There is a difference between being a facet or element of Applicant's services and being the "central focus" or "key aspect" of Applicant's services.)

Applicant's brief at 11-12, 4 TTABVUE 12-13 (emphasis added).

Applicant appears to argue that "lockdown alarm" describes only an insignificant element of Applicant's complex training services. However, many of the subjects of training that Applicant lists separately above are merely different aspects of the proper way to respond to the sounding of a lockdown alarm, stated in different words: "securing perimeters; identifying threats; … (… training … personnel to make life-saving decisions under immense pressure); responding to an actual crisis; … evacuation; securing a safe location; communicating with first-responders; and developing an overall crisis preparedness protocol." Proper response to a lockdown alarm is not a minor facet of Applicant's services. It is clear from the record that the proper response to the sounding of an alarm is considered an essential skill and is the subject of many other training programs:

> At least twice during the school year, students will practice what they should do upon hearing the "lockdown" alarm in the school.[20]

> Senior psychology major Marian Zgodinski, who has attended two A.L.I.C.E. training sessions, was taking an MCAT class on the third floor of the Student Center when the lockdown alarm sounded. "I feel like we were really prepared."[21]

> [T]he La Mirada Sheriff's station will conduct a first-of-its-kind campus-wide lockdown training exercise on Tuesday … "The goals of this exercise are to educate the Biola community and seek ways to improve our response capabilities."[22]

> The first indication of a shooting may include the sound of gunfire, people running away, people screaming or the

---

[20] Office Action of August 8, 2016 at 33.

[21] *Id*. at 34.

[22] Office Action of July 8, 2016 at 30.

> lockdown alarm being heard and seen. … If you hear the lockdown alarm, but haven't heard shots, then running may probably [*sic*] your best option …[23]
>
> If instructed to lockdown … or the Lockdown Alarm sounds …, Building Managers will attempt to lock building exterior doors, if possible and time permits:
>
> 1. Follow instructions.
>
> 2. In lieu of instructions …
>
> 3. Stay in the room until an "all clear" is sounded …[24]
>
> Anytime a lockdown alarm goes off, the school follows protocols it practices every year …[25]

The subject matter of any training is not an insignificant "facet" of the training. Rather, it is quite literally the focus of the training. In this case, relevant customers would readily understand LOCKDOWN ALARM to refer to the type of training identified in the application.

Although the record lacks examples of use by members of the public of phrases such as "lockdown alarm course," "lockdown alarm instruction," or "lockdown alarm training," such evidence is not absolutely necessary to a demonstration of genericness. As the Federal Circuit stated in *In re 1800Mattress.com*:

> The test is not only whether the relevant public would itself *use* the term to describe the genus, but also whether the relevant public would *understand* the term to be generic.

92 USPQ2d at 1685, *citing H. Marvin Ginn*, 228 USPQ at 530 (emphasis in original). Moreover, the Examining Attorney has presented analogous examples of

---

[23] *Id*. at 31.

[24] *Id*. at 12.

[25] *Id*. at 11.

usage that support the position that customers would understand LOCKDOWN ALARM to be the generic name of a type of training. The record contains at least six examples of use of "fire alarm training" or "fire alarm courses" to denote instruction in the proper use of a fire alarm.[26] Other examples show use of the generic name of a piece of equipment to denote training on the subject of how to use the equipment, such as "metal detector training,"[27] "firearms training,"[28] "security systems training,"[29] and "conventional power supplies online course."[30]

The record clearly shows that "lockdown alarm" is widely used as the name of a particular type of emergency signal device. Applicant's services include training as to the proper use of such devices and as to how to properly respond to the sounding of such a device, and the record shows that these are types of training that are known to relevant customers. We find that the record establishes that relevant customers would readily understand LOCKDOWN ALARM to refer to Applicant's safety, security, and crisis preparedness training. Accordingly, the refusal to register Applicant's proposed mark on the Supplemental Register is affirmed.

## II.     Refusal under Rule 2.61(b).

We turn next to the Examining Attorney's refusal under Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), on the ground that Applicant failed to comply with the Examining Attorney's requirement of information. Rule 2.61(b) provides that "[t]he

---

[26] Office Action of August 8, 2016 at 22-23, 25, 27, 29, 31.

[27] Office Action of July 8, 2016 at 22.

[28] *Id*. at 29.

[29] Office Action of August 8, 2016 at 25.

[30] *Id*. at 26.

Office may require the applicant to furnish such information, exhibits, affidavits or declarations … as may be reasonably necessary to the proper examination of the application." The rule recognizes that an applicant often is in the best position to supply the facts and information necessary for the Office to determine the registrability of a trademark and is designed to encourage efficient and high quality trademark examination. *See Star Fruits S.N.C. v. U.S.,* 393 F.3d 1277, 73 USPQ2d 1409, 1414 (Fed. Cir. 2005) (discussing analogous Rule 1.105 in patent examination). Failure to comply with an examining attorney's requirement of information under the rule is grounds for refusal of registration. *In re AOP LLC*, 107 USPQ2d 1644, 1651 (TTAB 2013); *In re Cheezwhse.com Inc.*, 85 USPQ2d 1917, 1919 (TTAB 2008); *In re DTI Partnership LLP*, 67 USPQ2d 1699 (TTAB 2003). *See generally* TMEP § 814 (January 2017).

To aid in his examination of the application, the Examining Attorney required Applicant to provide documents in the nature of "fact sheets, instruction manuals, brochures, advertisements and pertinent screenshots of applicant's website as it relates to the services" and to respond to four questions regarding the services and wording appearing in the mark.[31] The Examining Attorney contends that Applicant failed to respond suitably to three of the questions. The three questions, Applicant's responses,[32] and our discussion thereof are set forth below:

---

[31] The Examining Attorney first made the requirements in the Office Action of May 13, 2016 and later restated them in the Office Action of July 8, 2016 and the final Office Action of August 8, 2016.

[32] Applicant responded to the questions in its response filed July 13, 2016.

12

1.        Do the applicant's services involve the training of people as [*sic*] how to implement, enforce, or participate in a protocol followed in an emergency that involves confining people in a secure place, such as the confinement of prison inmates in cells after a disturbance, or the locking of students and teachers in classrooms after a violent attack or do the services involve a situation in which such a protocol is undertaken?

Response:   The Applicant's services involve training schools, universities, as well as other public and commercial buildings and establishments, in ways to enhance security and minimize exposure to active shooter and other mass-casualty events. Applicant's services also involve training said institutions in handling and responding to such emergency situations. While every crisis is different, part of the Applicant's training involves teaching staff on how to best protect students and others exposed to an active shooter threat, and in minimizing their exposure to an active shooter on the premises, until help arrives.

The Examining Attorney's questions are phrased in a way that appears intended to elicit from Applicant a response that Applicant's services conform directly to the AMERICAN HERITAGE DICTIONARY definitions of "lockdown" and "alarm," discussed above in Part I. For example, the Examining Attorney contends that Applicant did not state whether its training involved "a protocol" of the type described in the question.[33] However, in response to the requirement to provide documents (not at issue here), Applicant had already provided samples of its advertising that straightforwardly referred to "lockdown procedures," "lock-ins," and "best practices for … lockdown procedures."[34] We see little practical distinction between a "procedure" and a "protocol," in this context. Although Applicant's response to the question does not refer to "locking of students and teachers in classrooms," we do

---

[33] Examining Attorney's brief, 7 TTABVUE 17.

[34] Response of July 13, 2016 at 11-12.

not find the response to be insufficient under the circumstances. Applicant was entitled to describe its services in its own words and to characterize its methods for "how to best protect students and others" as less rigid than the methods described in the dictionary.

2.          Do the applicant's services involve or pertain to [*sic*] device or warning that is used to signal the protocol to confine people in a secure place for an emergency?

Response:   The Applicant's training services do not directly involve a "device or warning that is used to signal the protocol to confine people in a secure place for an emergency". Although, it is conceivable that in the event such as an active shooter crisis, an "emergency" alarm may sound to alert those on the premises of an active threat.

The Examining Attorney characterizes this response as "conditional," and complains that Applicant "did not state whether its training services involve or pertain" to the described warning device.[35] The Examining Attorney's view is too narrow, given that Applicant responded that its services "do not directly involve" such a device, and further elaborated. Applicant explained the context in which an emergency alarm device could figure in its training services.

3.          Do the applicant's services involve or pertain to a LOCKDOWN ALARM?

Response:   The Applicant respectfully submits that it is not sure that there is a specific device that is known as a "lockdown alarm" or that there is an alarm that has the generic designation, "lockdown alarm." Th[at] said, the Applicant's services relate to training in the field of crisis preparedness in situations such as an active shooter; how to minimize exposure to such danger; and how to react in the event of an actual emergency crisis. It is conceivable that in the event of a life-threatening emergency, such as [sic] active shooter crisis, that the premises may signal an

---

[35] Examining Attorney's brief, 7 TTABVUE 17.

> "emergency" alarm to notify people in the vicinity of the immediate threat.

The Examining Attorney again criticizes Applicant's response as "conditional" and complains that "Applicant's response did not indicate in the affirmative or negative if the Applicant's services involved or pertained to a LOCKDOWN ALARM." We find the Examining Attorney's question far too freighted with legal implications to fairly require a "yes or no" answer.[36] The question comes close to subsuming the ultimate question of whether the proposed mark is generic. Applicant explained, in its answer, how its services might "involve or pertain to" an "'emergency' alarm." Applicant was entitled to use its own words, instead of those suggested by the Examining Attorney, particularly given its contention that "lockdown alarm" is not the common term for a type of device.

We recognize that applicants normally are expected to answer "yes" or "no" to a question calling for such a response and that examining attorneys are not obligated to infer direct answers from narrative responses to such questions. However, examining attorneys should not elevate the form of an applicant's response to an information requirement over its substance. We find that Applicant was reasonably forthcoming in its responses, and did not withhold the required *information*. It merely insisted on giving the information in its own words, coupled with submission of a sample of its advertising. Accordingly, we reverse the refusal of registration under Rule 2.61(b).

---

[36] A question that focused more precisely on terminology, such as "Is LOCKDOWN ALARM an expression that is used in Applicant's industry?" might have fairly demanded a yes or no answer, although such an answer could validly be limited to the extent of the responder's knowledge.

Decision:  The refusal to register Applicant's mark on the Supplemental Register is AFFIRMED on the ground that the proposed mark is generic. The refusal based upon Rule 2.61(b) is REVERSED.