This Opinion Is a
Precedent of the TTAB

Hearing: August 16, 2022                    Mailed: February 16, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*In re Uman Diagnostics AB*
_____

Serial No. 88960633
_____

John Welch and Kira Khanh McCarthy of Wolf, Greenfield & Sacks, P.C.,
    for Uman Diagnostics AB

Lyal Fox, Trademark Examining Attorney, Law Office 113,
    Myriah Habeeb, Managing Attorney

_____

Before Shaw, Coggins, and Lebow,
    Administrative Trademark Judges.

Opinion by Lebow, Administrative Trademark Judge:

Applicant, Uman Diagnostics AB, has applied to register NF-LIGHT (in standard characters) on the Principal Register for, as amended, "specimen analysis kits containing reagents and assays for detecting neurological biomarkers in biological samples, serum, blood, plasma, saliva, and cerebrospinal fluid in human and animal samples used by medical and clinical researchers in labs and institutions" in

International Class 1, with a claim of acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).[1]

The Trademark Examining Attorney refused registration under Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052 and 1127, on the ground that the proposed mark is generic for the identified goods. He also refused registration under Section 2(e)(1), 15 U.S.C. § 1052(e)(1), on the alternative basis that if the mark is not generic, it is merely descriptive, and Applicant's claim of acquired distinctiveness based on at least five years' use and additional evidence is insufficient due to the highly descriptive nature of the mark.

After the refusals were made final, Applicant filed a notice of appeal, along with a request for reconsideration of the refusals that was subsequently denied. Applicant then filed a second request for reconsideration, which was also denied.[2] In the requests, Applicant also sought, in the alternative, to amend the application to the Supplemental Register, which the Examining Attorney denied because he held that the proposed mark is generic. The appeal then resumed; Applicant and the Examining Attorney filed their respective briefs; and an oral hearing was conducted at Applicant's request.

---

[1] Application Serial No. 88960633 was filed on June 11, 2020, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming a date of first use anywhere and in commerce of December 31, 2012.

All TTABVUE and Trademark Status and Document Retrieval ("TSDR") citations refer to the docket and electronic file database for the involved application. All citations to the TSDR database are to the downloadable .PDF version of the documents.

[2] In his second reconsideration letter, the Examining Attorney lodged objections to many of the evidentiary exhibits provided with Applicant's second request for reconsideration, but withdrew them in his appeal brief. 14 TTABVUE 3.

For the reasons discussed below, we affirm the refusals to register.

## I. Genericness

"A generic name—the name of a class of products or services—is ineligible for federal trademark registration." *U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. __, 140 S Ct. 2298, 2020 USPQ2d 10729, at *2 (2020). "A generic mark, being the 'ultimate in descriptiveness,' cannot acquire distinctiveness, and is not entitled to registration on either the Principal or Supplemental Register under any circumstances." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015) (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)). A term is generic if it refers to the class or category of goods or services on which it is used. *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001) (citing *Marvin Ginn*, 228 USPQ at 528).

"[A] term [also] is generic if the relevant public understands the term to refer to part of the claimed genus of goods [or "key aspect" of them] …, even if the public does not understand the term to refer to the broad genus as a whole." *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1638 (Fed. Cir. 2016) ("[T]he term 'pizzeria' would be generic for restaurant services, even though the public understands the term to refer to a particular sub-group or type of restaurant rather than to all restaurants."); *see also In re 1800Mattress.com IP LLC*, 586 F.3d 1359, 92 USPQ2d 1682, 1685 (Fed. Cir. 2009) ("The test is not only whether the relevant public would itself use the term to describe the genus, but also whether the relevant public would understand the term to be generic.").

The test for determining whether a proposed mark is generic is its primary significance to the relevant public. *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1553-54 (Fed. Cir. 1991); *Marvin Ginn*, 228 USPQ at 530. Making this determination "involves a two-step inquiry: First, what is the genus of goods … at issue? Second, is the term sought to be registered … understood by the relevant public primarily to refer to that genus of goods or services?" *Marvin Ginn*, 228 USPQ at 530.

As a general rule, an abbreviation, acronym or initialism is generic if the wording it stands for is generic of the goods or services, and the abbreviation, acronym or initialism is understood by relevant purchasers to be substantially synonymous with the generic wording it represents. *See, e.g.*, *Baroness Small Estates, Inc. v. Am. Wine Trade, Inc.*, 104 USPQ2d 1224, 1226 (TTAB 2012) ("The question to be answered is whether the initials for generic or merely descriptive terms, or a combination thereof, are also generally recognized and used as an accepted abbreviation for the term itself.") (citing *Modern Optics, Inc. v. Univis Lens Co.*, 234 F.2d 504, 110 USPQ 293, 295 (CCPA 1956)); *Capital Project Mgmt. Inc. v. IMDISI Inc.*, 70 USPQ2d 1172, 1180-83 (TTAB 2003) ("TIA" is substantially synonymous with generic term "time impact analysis" and thus is generic for type of construction project schedule analysis services); *In re Gen. Aniline & Film Corp.*, 136 USPQ 306, 306-07 (TTAB 1962) (holding "PVP" substantially synonymous with generic term "polyvinylpyrrolidone" and therefore generic for the synthetic resin polyvinylpyrrolidone).

### A. The Genus

Addressing the first part of the *Marvin Ginn* genericness inquiry, we find, and the Examining Attorney and Applicant agree,[3] that the genus of goods in this case is appropriately defined by the identification of goods in the application: "Specimen analysis kits containing reagents and assays for detecting neurological biomarkers in biological samples, serum, blood, plasma, saliva, and cerebrospinal fluid in human and animal samples used by medical and clinical researchers in labs and institutions." *See Magic Wand*, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of services set forth in the [application or] certificate of registration.").

Because the identification of goods in the application is broadly worded, however, acknowledging that the identification is the appropriate genus in this case does not end our discussion under this inquiry. To appreciate the evidence in this case and its significance as it pertains to the term NF-LIGHT, we also need to understand how Applicant's actual goods fit into the genus, which is not immediately apparent from the identification of goods on its face. To assist in that understanding, we note the definitions of two terms used routinely throughout the evidence, and in argument:

(a) "**Neurofilaments**" are defined throughout the evidence and those definitions are fairly similar. The following definition comes from a February 7, 2019 article in the Journal of Clinical Laboratory Analysis titled "Neurofilament Levels in patients with neurological diseases: A comparison of neurofilament light and heavy chain

---

[3] 14 TTABVUE 5 (Examining Attorney's Brief); 12 TTABVUE 7 (Applicant's Brief).

levels" that was introduced by both Applicant and the Examining Attorney.[4] As explained in that article:

> Neurofilaments (NFs) are the main structural proteins of neurons and are members of the class IV intermediate filament protein family. NFs are selectively expressed in the nervous system and are found at the highest levels in long projection axons. They are composed of four subunits, namely NF light (NFL), NF medium (NFM), and NF heavy (NFH) chain subunits plus an unstable alpha internexin subunit.[5]

(b) An "**ELISA,**" the acronym for an "enzyme-linked immunosorbent assay,"[6] is "[a] sensitive immunoassay that uses an enzyme linked to an antibody or antigen as a marker for the detection of a specific protein, especially an antigen or antibody."[7]

As the Examining Attorney points out, "per the applicant's webpage, the applicant's goods are enzyme-linked immunosorbent assay (ELISA) kits for the 'fast quantification (<3 hours) of neurofilament light in cerebrospinal fluid.'"[8] An excerpt from the page is shown below:

---

[4] March 17, 2021 Response to Office Action, pp. 41-48. Applicant also submitted a copy of this article with its December 20, 2021 Request for Reconsideration, pp. 33-40. One submission would have been sufficient.

[5] *Id*. at 41.

[6] MERRIAM-WEBSTER DICTIONARY, merriam-webster.com/dictionary/ELISA, accessed on October 19, 2022. "The Board may take judicial notice of dictionary definitions, including online dictionaries, definitions in technical dictionaries and translation dictionaries that exist in printed format, and we elect to do so here." *In re Omniome, Inc.*, 2020 USPQ2d 3222, at \*2 n.17 (TTAB 2019); *see generally Hancock v. Am. Steel & Wire Co.*, 203 F.2d 737, 97 USPQ 330, 332 (CCPA 1953).

[7] AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, www.ahdictionary.com/word/search.html?q=ELISA, accessed on October 19, 2022.

[8] 14 TTABVUE 4 (citing September 17, 2020 Response to Office Action, p. 14).

## NF-Light ELISA Assay

The NF-light® (Neurofilament light) ELISA allows fast quantification (<3 hours) of neurofilament light in cerebrospinal fluid. The amount of sample is small (50 µl) and the standard curve ranges from 100-10000 pg/ml allowing for direct measurement of NF-L in many different neurological conditions.

*See In re Reed Elsevier Props.*, 482 F.3d 1376, 82 USPQ2d 1378, 1380 (Fed. Cir. 2007) ("In determining the meaning of 'information exchange about legal services' as defined by Reed's application, the board appropriately reviewed the www.lawyers.com website for context, to inform its understanding of the term."); *see also In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1423 (Fed. Cir. 2005) (examining the subject website in order to understand the meaning of terms for which coverage was sought and thereby define the genus of covered services).

Applicant, citing to the declaration of its founder, vice president, and managing director, Niklas Norgren,[9] confirms the nature of its identified goods as ELISA kits used to detect proteins, in particular, the neurofilament light protein generated in the human brain:

> Applicant was founded in 2006 and focuses on developing reagents for use in enzyme-linked immunosorbent assays that are commonly known in the industry as ELISA tests. ELISA tests are used to detect proteins and other analytes. A "target analyte" is the substance measured by an ELISA kit. …
>
> Applicant's products detect the neurofilament light protein that is generated in the human brain.[10]

---

[9] September 27, 2021 Request for Reconsideration, pp. 68-69.

[10] 12 TTABVUE 13.

As the Examining Attorney observes, "applicant has not, at any point during the prosecution of this application, contended that their [sic] goods are not ELISA kits for the detection of neurofilament light. In fact, the applicant has unequivocally admitted that the 'target analyte' of their ELISA kits is neurofilament light."[11]

We find that Applicant's broadly worded identification of goods (the genus in this case)—"specimen analysis kits containing reagents and assays for detecting neurological biomarkers in biological samples, serum, blood, plasma, saliva, and cerebrospinal fluid in human and animal samples used by medical and clinical researchers in labs and institutions"—encompasses the enzyme-linked immunosorbent assays (ELISA) kits for detecting neurological biomarkers, namely neurofilament light protein that Applicant actually provides under its purported mark. Applicant's ELISA kits are thus a subset of the broad genus of goods identified in the application, and neurofilament light—the particular "neurological biomarker" detected by Applicant's kit—is a subcategory and key aspect of the genus.

Accordingly, if we find that the relevant public (medical/clinical researchers) understands the term "NF-Light" to refer primarily to that key aspect, then we would find that term generic, "even if the public does not understand the term to refer to the broad genus as a whole." *Cordua*, 118 USPQ2d at 1638 (finding substantial evidence supported the Board's conclusion that CHURRASCOS was generic because

---

[11] 14 TTABVUE 4-5. Applicant emphasizes that "[n]eurofilament light is ***not*** an interchangeable term for the **reagents and assays** contained in Applicant's specimen analysis kits," 12 TTABVUE 6, which misses the point.

it referred to a key aspect of restaurant services featuring grilled meat); *see also Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1047 (Fed. Cir. 2018) ("The Board therefore must consider whether ZERO is generic because it refers to a key aspect of at least a sub-group or type of the claimed beverage goods."); *In re Twenty-Two Desserts, LLC*, 2019 USPQ2d 292782, at *5 (TTAB 2019) (holding MALAI, which refers to an Indian dairy ingredient, generic for applicant's frozen desserts because relevant consumers would understand it to refer to a key aspect or subcategory of the genus of the goods).

### B. The Relevant Public's Understanding of NF-LIGHT

We turn now to the second part of the *Marvin Ginn* inquiry: whether the term "NF-Light" is understood by the relevant public primarily to refer to that genus of goods. As indicated in the description of goods, the relevant public in this case is composed of "medical and clinical researchers in labs and institutions."

"Evidence of the public's understanding of [NF-Light] may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications." *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); *see also USPTO v. Booking.com B.V.*, 2020 USPQ2d 10729, at *7 n.6 ("Evidence informing [a genericness] inquiry can include not only consumer surveys, but also dictionaries, usage by consumers and competitors, and any other source of evidence bearing on how consumers perceive a term's meaning."). In some cases, dictionary definitions and an applicant's own description of its goods may suffice to show genericness. *In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1112 (Fed. Cir.

1987); *see also In re Am. Fertility Soc'y*, 188 F.3d 1341, 51 USPQ2d 1832, 1836 (Fed. Cir. 1999); *In re Consumer Protection Firm PLLC*, 2021 USPQ2d 238, at *8 (TTAB 2021) ("In assessing the primary significance of Applicant's Proposed Marks to the relevant public, we also may consider Applicant's use thereof.").

The Examining Attorney argues that "'NF-light' is a well-established abbreviation for the wording [']neurofilament light['] (notwithstanding other common abbreviations for neurofilament light)."[12] He provided numerous articles from scientific journals to support this contention, including the following examples from the record that he asserts "best exemplif[y]" the common usage of that term:

- A page from Applicant's own website describing Applicant's NF-Light ELISA Assay states that Applicant's "**NF-Light® (Neurofilament light)** ELISA allows fast quantification (<3 hours) of neurofilament light in cerebrospinal fluid."[13]

- An excerpt from a February 10, 2020 scientific publication in Nature Communications journal on National Institutes of Health (NIH) National Library of Medicine website titled "Serum neurofilament light levels in normal again and their association with morphologic brain changes" uses "Nf" as an abbreviation for neurofilament ("In the last few years, **neurofilament (Nf)** proteins have gained increasing attention in this direction"), and refers to this neurofilament light subunit as "Nf light" ("Repeated CSF collection, i.e. follow-up studies are even more difficult to justify. This has changed with the introduction of the single molecule array (Simoa) technology, which provides now the analytical basis for highly sensitive quantitation of the **Nf light** (NfL) subunit in the peripheral blood.").[14]

- An excerpt from an October 1, 2016 scientific publication on NIH's National Library of Medicine website titled "Comparison of three analytical platforms for quantification of the neurofilament light chain

---

[12] 14 TTABVUE 5 (Examining Attorney's Brief).

[13] September 17, 2020 Office Action, p. 14.

[14] March 27, 2021 Final Office Action, p. 25.

in blood samples: ELISA, electrochemiluminescence immunoassay and Simoa" refers to the "neurofilament light chain" as an "Nf light chain" ("We aimed at comparing a widely used conventional ELISA for **Nf light** chain (NfL) with an electrochemiluminescence-based method….").[15]

- An undated abstract of an article from the Aging journal on the University of Alabama at Birmingham's website titled "Diagnostic performance of new and classic CSF biomarkers in age-related dementias" abbreviates neurofilament as "NF-," and neurofilament light as "NF-light" ("One hundred fifty-three patients were recruited and tested for … novel candidate biomarkers – **neurofilament (NF-)** light…. All dementia patients had significantly higher concentrations of **NF-light** compared to CNS with the TP group displaying the highest **NF-light** values.").[16]

- A January 28, 2003 article from Neurology titled "Neurofilament light chain antibodies reflect cerebral atrophy in MS" refers to the neurofilament light subunit as "NF-light," using it as an abbreviation, including in an article sub-heading ("**NF-light**: Disease marker or just another antibody in MS" / "The degree of scatter of the data among patients suggests that quantitating CSF **NF-light** may not yet be useful in evaluating an individual patient in the clinic.").[17]

- A November 2015 article from the Medicine journal titled "Serum Phosphorylated Neurofilament-Heavy Chain, a Potential Biomarker, is Associated With Peripheral Neuropathy in Patients With Type 2 Diabetes" uses "NF" as an abbreviation for neurofilament and "NFs" for the plural form (**"Neurofilament (NF)**, one of the major axonal cytoskeletal proteins, plays a critical role in degenerative diseases in both the central and the peripheral nervous systems." / "**Neurofilaments (NFs)**, which is one of the predominant structural proteins in axons, enact important functions…."), and abbreviates neurofilament light as "NF-light" ("**NFs** consist of 3 subunits, namely **NF-light** (L), NF-medium (M), and NF-heavy (H), as defined by their molecular weight.").[18]

- An excerpt from a February 10, 2014 scientific publication in Sage's Multiple Sclerosis Journal titled "Neurofilament light antibodies in

---

[15] *Id.*, p. 26.

[16] *Id.*, p. 28.

[17] *Id.*, pp. 29-30.

[18] *Id.*, pp. 31-32.

serum reflect response to natalizumab treatment in multiple sclerosis" refers to a neurofilament as "NF," and to the neurofilament light subunit as "NF light" ("**Neurofilament (NF)** proteins consisting predominantly of **NF light** (NF-L), medium (NF-M) and heavy … are major structural components of neurons.").[19]

- An excerpt from a June 11, 2020 scientific publication in Frontiers in Neurology Journal titled "Acute Neurofilament Light Chain Plasma Levels Corelate With Stroke Severity and Clinical Outcome in Ischemic Stroke Patients" abbreviates neurofilament as "NF" and refers to the neurofilament light subunit as "NF light" ("We studied **neurofilament (NF)** expression in 2 cases of human postmortem stroke…." / "**NFs** are highly specific structural, neuronal cytoskeletal proteins that consist of four **NF** subunits: **NF light** (NF-L), NF medium (NF-M), and NF heavy (NF-H) chains, and alpha-internexin.").[20]

- A May 20, 2019 scientific publication in the Journal of Clinical Laboratory Analysis titled "Neurofilament Levels in patients with neurological diseases: A comparison of neurofilament light and heavy chain levels" abbreviates neurofilaments as "NFs" and explains that "NF-light" is one of the four subunits ("Neurofilaments (**NFs**) are selectively expressed in the nervous system and are found at the highest levels in long projection axons. They are composed of four subunits, namely **NF light** (NFL), NF medium (NFM), and NF heavy (NFH) chain subunits, plus an unstable alpha-internexin subunit.").[21]

- A March 25, 2013 publication in the Multiple Sclerosis journal titled "A comparative study of CSF neurofilament light and heavy chain protein in MS" abbreviates neurofilaments as "Nfs" and refers to neurofilament light as "Nf light" in its identification of the four neurofilament subunits ("Neurofilaments (Nfs) are major structural elements of neurons that are specifically expressed in axons and dendrites. They are heteropolymers composed of four subunits: the triplet of the **Nf light** (NfL), medium (NfM) and heavy (NfH) chain, and either a-internexin in the central or peripherin in the peripheral nervous system.").[22]

- An excerpt from a 2007 publication on the website of Science Direct titled "Amyotrophic Lateral Sclerosis: Idiopathic and Inherited" uses

---

[19] *Id.*, p. 33.

[20] *Id.*, pp. 35-36.

[21] December 20, 2021 Request for Reconsideration, pp. 33-40.

[22] *Id.*, pp. 42-48.

"NF" as an abbreviation for neurofilament and refers to neurofilament light as "NF-Light" when identifying the four neurofilament subunits ("**Neurofilament (NF)** proteins represent the majority of cytoskeletal proteins that are present in motor neurons. … Three distinct neurofilament protein subunits exist, differing molecular weight: NF-heavy, NF-medium, and **NF-light**").[23]

- The glossary of a March 25, 2015 scientific publication in the Neurology journal titled "Fingolimod and CSF neurofilament light chain levels in relapsing-remitting multiple sclerosis" abbreviates neurofilaments as "Nf" and refers to neurofilament light as "NF-light" in its identification of the four neurofilament subunits ("**Neurofilaments (Nf)** are neuronal structural proteins composed of 4 subunits: the triplet of **Nf-light** (NfL), Nf-medium, and Nf-heavy (NfH) chains, and a-internexin in the CNS, or peripherin in the peripheral nervous system.").[24]

- A September 20, 2013 scientific publication in the PLOS ONE journal titled "Increased Neurofilament Light Chain Blood Levels in Neurodegenerative Neurological Diseases" abbreviates neurofilaments as "NF" and refers to neurofilament light as "Nf light" in its identification of the four neurofilament subunits ("**Neurofilaments (NF)** are highly specific major structural proteins of neurons, consisting predominantly of four subunits: **Nf light** (NfL), Nf medium (NfM) and Nf heavy (NfH) chain and alpha-internexin.").[25]

- The website of competitor Merkel Technologies Ltd. (which, like Applicant, offers ELISA technologies) abbreviates neurofilament light as "**NF light**" and "**NF-light**" in its description of that protein neuron subunit.[26]

- A February 19, 2021 scientific publication in the Neural Regeneration Research journal titled "Current application of neurofilaments in amyotrophic lateral sclerosis and future perspectives" abbreviates neurofilament as "NF" and neurofilaments as "NFs," and refers to neurofilament light as "NF light" in its identification of the four neurofilament subunits (**"[N]eurofilaments (NFs)** are the most promising and validated in the perspective of clinical translation…. To

---

[23] January 18, 2022 Reconsideration Letter, pp. 11-12.

[24] *Id.,* pp. 19-28.

[25] *Id.*, pp. 29-41.

[26] *Id.*, pp. 55-57.

date, four subunits of NFs have been recognized: **NF light** (NfL), NF medium (NfM) and NF heavy (NH) chain and alpha-internexin.").[27]

- An April 23, 2018 scientific publication in the Hypertension journal titled "Neurofilament as Neuronal Injury Blood Marker in Preeclampsia" abbreviates neurofilaments as "Nf" and refers to neurofilament light as "Nf light" in its identification of the four neurofilament subunits ("**Nf (neurofilaments)** are highly specific major scaffolding proteins of neurons consisting of 4 subunits: the triplet of NfL (**Nf Light**), Nf medium, and NfH (Nf heavy) chains and a-internexin in the CNS, or peripherin in the peripheral nervous system.").[28]

- An excerpt from a July 28, 2009 scientific publication in the PNAS journal titled "MSC p43 required for axonal development in motor neurons," refers to neurofilaments as "NFs," and the neurofilament light protein subunit as "NF light" ("**Neurofilaments (NFs)** constitute the main cytoskeletal network maintaining the structural integrity of neurons…. The MSC p43 protein was predominantly expressed in central neurons and interacted with **NF light** subunit in vivo.").[29]

The Examining Attorney cites additional references that use "NF" as an abbreviation for neurofilament, such as The Free Dictionary by Farlex, Wikipedia, and a July 15, 2012 article from the Journal of Cell Science titled "Neurofilaments at a glance."[30] Based on that type of evidence, he argues that "even if the relevant consumers were unaware to the fact that NF-LIGHT is a direct abbreviation for neurofilament light, they would still understand the NF in NF-LIGHT to be the abbreviation for neurofilament and would recognize and understand the meaning of NF-LIGHT as referring to neurofilament light."[31]

---

[27] *Id.*, pp. 58-67.

[28] *Id.*, pp. 69-84.

[29] *Id.*, p. 106.

[30] *Id.*, pp. 7-8 (*see* September 17, 2020 Office Action, pp. 7-11).

[31] *Id.*, p. 8.

In view of the foregoing evidence, the Examining Attorney argues, and we find, "that the term NF-LIGHT, or similar variation NF light, is a commonly used and well recognized abbreviation for the neurofilament light subunit, and is used as such by medical and clinical researchers in the relevant field of use."[32] Indeed, the evidence shows the terms to be substantially synonymous. *Baroness Small Estates,* 104 USPQ2d at 1226.

The record also shows that term NF-Light (or NF Light) is used by competitors as an abbreviation for the neurofilament light subunit. Use by competitors in the field is strong evidence of genericness. *See BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 35 USPQ2d 1554, 1558 (Fed. Cir. 1995) ("The cases have recognized that competitor use is evidence of genericness.") (citing *Remington Prods., Inc. v. N. Am. Philips Corp.*, 892 F.2d 1576, 13 USPQ2d 1444, 1446 (Fed. Cir. 1990)); *Cont'l Airlines, Inc. v. United Air Lines, Inc.,* 53 USPQ2d 1385, 1395 (TTAB 1999) (use of term "e-ticket" by media and competitors indicates term is generic for electronic tickets); *Philip Morris Inc. v. Brown & Williamson Tobacco Corp.*, 230 USPQ 172, 176 (TTAB 1986) (finding evidence that competitors have used a particular word as the name of their goods is persuasive evidence of genericness). For example:

- R&D Systems identifies one of its assay kits as a Simple Plex Human NF-L Cartridge, and in the summary indicates that NF-Light is one of the alternate names for the neurofilament light subunit:[33]

---

[32] 14 TTABVUE 7 (Examining Attorney's Brief).

[33] March 27, 2021 Final Office Action, p. 22.

- Merkel Technologies Ltd., which offers ELISA products, abbreviates the neurofilament light subunit as "**NF light**" and "**NF-light**" in its description of that protein neuron subunit, along with NfL:[34]

- Novus Biologicals provides ELISA kits for detecting neurofilament light and abbreviates that neurofilament subunit as "NF-Light" in a product description explaining neurofilaments:[35]

The record thus demonstrates not only that "NF-Light" (or "NF Light") is commonly used and a well-recognized abbreviation for the neurofilament light

---

[34] January 18, 2022 Reconsideration Letter, pp. 55-57.

[35] *Id.*, p. 27.

subunit by medical and clinical researchers (the relevant public), but it is also recognized and used by third-party competitors.

## C.    Applicant's Arguments and Evidence

Applicant does not challenge the probative value of the Examining Attorney's evidence, which clearly shows "NF-Light" and slight variations thereof (e.g., different capitalization, and without a hyphen) being used as an abbreviation for "neurofilament light." Instead, Applicant makes several arguments that we address below.

### 1.    Consumer Sophistication

Applicant contends that its goods "are manufactured in and for a highly specialized field and are marketed to extremely sophisticated purchasers who exercise a high degree of care in their purchasing decisions."[36] According to Applicant:

> The goods are used not by ordinary consumers, but by medical and clinical researchers in labs and institutions, as clearly delineated in the identification of goods. The medical and clinical research conducted by these individuals are highly regulated under the U.S. Food Drug and Cosmetic Act, the Clinical Laboratory Improvements Act, the Declaration of Helsinki, and similar laws and regulations. The medical and clinical researchers using Applicant's products (i.e., the "relevant public"), operate in a highly regulated and technical field at the cutting edge of research on neuronal diseases such as Alzheimer's disease, multiple sclerosis, traumatic brain injury, and amyotrophic lateral sclerosis.[37]

While sophistication of consumers can have relevance in a Section 2(d) refusal, Applicant has provided no case law that consumer sophistication plays any role in

---

[36] 12 TTABVUE 7 (Applicant's Brief).

[37] *Id.* (citations omitted).

determining whether a mark is generic. To the extent it is relevant, the evidentiary record includes frequent generic use of Applicant's proposed mark within the clinical and medical research industry, which the purchasers Applicant deems sophisticated would be accustomed to seeing. There is no basis to find that the relevant public would understand NF-Light as representing anything other than neurofilament light, the target analyte of Applicant's ELISA kits. If anything, the medical and clinical researchers' expertise would render them more likely to understand the generic nature of NF-LIGHT.

Furthermore, as noted above, Applicant does not challenge the probative value of any of the Examining Attorney's evidence showing generic use of the term NF-LIGHT to describe the neurofilament light subunit. Hence, to the extent that clinical and medical researchers may be sophisticated has any bearing on their perception of the term NF-LIGHT as generic, it supports the finding that those consumers use it as a generic term.

### 2. Incorrect Abbreviation

Applicant also argues that "the abbreviation for 'neurofilament light' is NfL or NEFL, not NF-LIGHT. This fact is confirmed by the multitude of peer-reviewed journal articles that have been previously made of record" and "the Examining Attorney's own evidence confirms that the relevant public refers to 'neurofilament light' as NfL or NEFL."[38]

---

[38] 12 TTABVUE 7 (Applicant's Brief).

Applicant's argument is a red herring. The Examining Attorney does not dispute that "NfL and NFEL are other common abbreviations for neurofilament light," but notes that "the evidence clearly establishes that NF-LIGHT is also a common abbreviation for neurofilament light."[39] The evidence in this case clearly shows that NF-light (and slight variations thereof) is used as an abbreviation for, and substantially synonymous with, neurofilament light. The fact that NfL and NEFL are also used as abbreviations for neurofilament light does not detract from the term's primary significance to the relevant public. *See 1800Mattress.com*, 92 USPQ2d at 1685 ("We ... disagree with Dial-A-Mattress's assertion that there can only be one generic term, which is 'online mattress stores.' Instead, any term that the relevant public understands to refer to the genus of 'online retail store services in the field of mattresses, beds, and bedding' is generic."); *Clairol, Inc. v. Roux Distrib. Co.*, 280 F.2d 863, 126 USPQ 397, 398 (CCPA 1960) ("The same merchandise may, and often does, have more than one generic name.").

### 3. Industry Naming Convention

Applicant asserts that "in the industry for goods such as Applicant's specimen analysis kits, the relevant consumers describe the reagents and assays (i.e., the goods) by stating the product brand name (i.e., the trademark) followed by the name of the target analyte and then the generic designation of the type of kits."[40] To

---

[39] 14 TTABVUE 15-16 (Examining Attorney's Brief).

[40] 12 TTABVUE 8 (Applicant's Brief).

illustrate this point, Applicant provides the table below showing how other companies

in Applicant's industry describe their kits:[41]

| Reference | Product | Trademark | Target Protein/Analyte | Generic Descriptor |
|---|---|---|---|---|
| Office Action dated Sep. 17, 2020 at p. 15 | LifeSpan Biosciences NF-L / NEFL ELISA Kit | LifeSpan Biosciences | NF-L/NEFL | ELISA Kit |
| Office Action dated Sep. 17, 2020 at p. 15 | Biomatik Human Neurofilament Light Polypeptide (NEFL) ELISA Kit | Biomatik | Human Neurofilament, Light Polypeptide (NEFL) | ELISA Kit |
| Office Action dated Sep. 17, 2020 at p. 15 | MyBioSource.com Canine Neuofilament light polypeptide (NEFL) ELISA Kit | MyBioSource.com | Canine Neurofilament light polypeptide (NEFL) | ELISA Kit |
| Office Action dated Sep. 17, 2020 at p. 15 | Aviva Systems Biology NEFL High Sensitivity ELISA Kit | Aviva Systems Biology | NEFL | High Sensitivity ELISA Kit |
| Office Action dated Sep. 17, 2020 at p. 16 | "MagQu" Neurofilament light IMR Reagent | MagQu | Neurofilament light | IMR Reagent |
| Office Action dated Mar. 27, 2021 at p. 12 | Elabscience Human NEFL (Neurofilament Light Polypeptide) ELISA Kit | Elabscience | HumanNEFL (Neurofilament Light Polypeptide) | ELISA Kit |
| Office Action dated Mar. 27, 2021 at p. 16 | Aviva Systems Biology Human Nfl Elisa Kita | Aviva Systems Biology | Human NfL | Elisa Kit |
| Office Action dated Mar. 27, 2021 at p. 16 | Biorbyt Human Neurofilament Light Elisa Kit | Biorbyt | Human Neurofilament Light | Elisa Kit |
| Office Action dated Mar. 27, 2021 at p. 20 | Myriad RBM's Ultrasensitive SimoaTMNF-L Immunoassay | Myriad RBM's Ultrasensitive Simoa™ | NF-LF | Immunoassay |

Applicant then shows that it uses the same formatting:[42]

---

[41] *Id.*, pp. 8-9.

[42] *Id.*, p. 9.

| Reference | Product | Trademark | Target Protein/Analyte | Generic Descriptor |
|---|---|---|---|---|
| Office Action dated Mar. 27, 2021 at p. 9 | NF-LIGHT Neurofilament light ELISA | NF-LIGHT | Neurofilament light | ELISA |

Based on this showing, Applicant argues that:

> [C]ompanies manufacturing products similar to those of Applicant utilize a very particular naming convention. … The product listings all include non-trademark usage of the target analyte by referring only generically to the analyte. Uniformly, these products refer to "neurofilament light" (or the abbreviations NfL or NEFL) as the target analyte. None of the references to third-party products shows use of Applicant's mark, NF-LIGHT, as an abbreviation for the target analyte or as a generic term to describe the diagnostic kits used to detect the target analyte. This clearly demonstrates that the relevant public understands the important distinction between trademark usage and reference to the target analyte. When referring to the particular product, common usage in the industry is to include the target analyte immediately followed by a generic descriptor (e.g., neurofilament light ELISA Kit). In cases where a trademark is used to identify the source of a particular product used to detect a target analyte, Applicant's industry states the trademark first, the target analyte second, and the generic description of the product last.

This argument, which essentially suggests that NF-LIGHT cannot be generic because competitors refer to neurofilament light using different abbreviations, is without merit. Of all of the examples in Applicant's tables, Applicant is the only manufacturer using this common abbreviation for the target analyte **as its proposed trademark**. The third-party companies' use of other terms such as LifeSpan Biosciences, Biomatik, Aviva Systems Biology, or Biorbyte as trademarks can hardly be analogized to Applicant's use of Nf-Light, which the record shows will be perceived as a commonly used abbreviation for neurofilament light, the target analyte of Applicant's ELISA kits.

Moreover, Applicant's own usage identifies instances of "NF-Light" without further abbreviation (e.g., NfL or NFEL) in the main heading, and then clarifies the meaning of the NF-Light abbreviation in the text:[43]



This use is similar to competitor Elabscience's identification of the neurofilament light polypeptide analyte targeted by its ELISA kit, which uses the alternate neurofilament light subunit abbreviation NEFL, followed by the full wording in parentheses that clarifies or confirms its meaning:[44]



---

[43] September 17, 2020 Response to Office Action, p. 14.

[44] March 27, 2021 Final Office Action, p. 12.

As with Applicant's use, Elabscience's use of a particular abbreviation or naming convention has no bearing on whether ELABSCIENCE is or is not a generic term.

### 4. Declaration Evidence

Applicant argues that the two "declarations signed by members of Applicant's industry" it provided "confirm that the relevant public understands NF-LIGHT as a source indicator."[45] The first declaration is from Applicant's vice president and managing director, Niklas Norgren, who asserts inter alia that Applicant's neurofilament antibodies are "widely-recognized by researchers and biopharmaceutical and diagnostics companies world-wide as the premier solution for detecting Nf-L," and that Applicant "coined" the trademark NF-LIGHT that Applicant has used in connection with its ELISA kit since as early as November 13, 2012.[46]

The Examining Attorney asserts that "the self-serving statements in this particular declaration are not persuasive, and do not evidence the relevant public's understanding of the term NF-LIGHT, but instead evidence only the applicant's intent that the mark be source identifying."[47]

The second declaration is from Dr. Jens Kuhle, head of the Multiple Sclerosis Centre and a senior physician at the University Hospital Basel in Switzerland, who states in relevant part that:

> 4. Medical researchers use the acronyms "Nf-L" or "NFL" to refer to the protein neurofilament light.

---

[45] 12 TTABVUE 10 (Applicant's Brief).

[46] September 27, 2021 Request for Reconsideration, pp. 68-70.

[47] 14 TTABVUE 16-17 (Examining Attorney's Brief).

5. I am aware that [Applicant] developed and produces an antibody for detecting neurofilament light and that this product is called NF-LIGHT. The mark NF-LIGHT refers to [Applicant's] products for detecting the Nf-L protein.

6. [Applicant's] NF-LIGHT products are widely recognized by researchers and biopharmaceutical and diagnostic companies world-wide as the premier solution for detecting Nf-L to advance the development of diagnostics tests and treatments for neurodegenerative conditions such as multiple sclerosis, Alzheimer's, and traumatic brain injury.[48]

The Examining Attorney asserts that this declaration "contains incomplete statements that fail to establish the relevant public's understanding of the wording NF-LIGHT. Specifically, Dr. Kuhle merely states that the acronyms 'Nf-L' or 'NFL' are used by medical researchers to refer to neurofilament light. However, there is no statement that neurofilament [light] does not have other abbreviations and/or is not also abbreviated NF-LIGHT."[49] He adds that "Dr. Kuhle's statement that applicant's 'products are widely recognized' is irrelevant," as "[t]he determination of whether the applicant's 'products' are widely recognized by consumers as 'the premier solution for detecting Nf-L' has no [bearing] in this case …."[50]

Neither declaration is particularly probative on the issue of genericness. As noted by the Examining Attorney, Mr. Norgren's testimony carries little weight on the issue of the relevant public's perception of NF-LIGHT given its conclusionary nature and his interest in the case. *See, e.g.*, *Velander v. Garner*, 348 F.3d 1359, 68 USPQ2d 1769

---

[48] September 27, 2021 Request for Reconsideration, pp. 72-73.

[49] 14 TTABVUE 17 (Examining Attorney's Brief).

[50] *Id.*

(Fed. Cir. 2003) ("In giving more weight to prior publications than to subsequent conclusory statements by experts, the Board acted well within [its] discretion.") (citations omitted); *In re Activevideo Networks, Inc.*, 111 USPQ2d 1581, 1606 (TTAB 2014) (conclusory declarations by applicant's vice president of marketing failed to provide contextual information about sales and failed to establish that purchasing public came to view alleged mark as indicator of source); *In re Central Counties Bank*, 209 USPQ 884, 888 (TTAB 1981) (statement by applicant bank's officials that descriptive term CASH RESERVE CHECKING is recognized as a source indicator is entitled to little if any probative value). His declaration does not, in any way, establish that NF-LIGHT is not perceived as a generic term for the identified goods and, as the Examining Attorney suggests, is more indicative of Applicant's intent that the proposed mark be source identifying than anything else.

Further, even if Norgren's claim that Applicant coined the term NF-light was true, the fact that a party is the first and only user of a generic designation does not justify registration. *Merrill Lynch*, 4 USPQ2d at 1142 ("To allow trademark protection for generic terms, i.e., names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.") (quoting *CES Publ'g Corp. v. St. Regis Publ'ns, Inc.*, 531 F.2d 11, 188 USPQ 612, 615 (2d Cir. 1975)); *In re Preformed Prods. Co.*, 323 F.2d 1007, 139 USPQ 271, 273 (CCPA 1963) (exclusive use, even when coupled with "large sales volume of such goods and its substantial advertising expenditure … cannot take the common descriptive name of

an article out of the public domain and give the temporarily exclusive user of it exclusive rights to it, no matter how much money or effort it pours into promoting the sale of the merchandise.") (quoting *J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437, 440, 1960 Dec. Comm'r Pat. 418 (CCPA 1960)). *Cf. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 72 USPQ2d 1833, 1838 (2004) (discussing "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first."). As discussed in the next section, however, generic use of the term NF-LIGHT did not begin with Applicant.

The Kuhle declaration also has limited probative value. Dr. Kuhle's statement that Nf-L and NFL are abbreviations for neurofilament light used by medical researchers does not detract from the evidence in this case showing that NF-Light is also a common abbreviation for neurofilament light used by medical and clinical researchers. Nor does his acknowledgement that Applicant uses its proposed mark NF-LIGHT to identify its "antibody for detecting neurofilament light," which the evidence shows is also commonly referred to as NF-Light. We also agree with the Examining Attorney's observation that the popularity of Applicant's product is not relevant to the relevant public's perception of the proposed mark.

Despite Norgren's and Kuhle's declared perceptions of NF-LIGHT as a trademark, both Norgren and Kuhle have used the term NF-LIGHT generically in scientific publications that are of record. For example, a 2013 study titled "Increased neurofilament light chain blood levels in neurodegenerative diseases" in PLOS One journal that included authors Norgren and Kuhle that use Applicant's ELISA kit and

refers to it as "[a] commercially available ELISA (UmanDiagnostics NF-light®
assay)" also explains that "Neurofilaments (NF) are highly specific major structural
proteins of neurons, consisting predominantly of four subunits: **Nf light** (NfL), Nf
medium (NfM) and Nf heavy (NfH) chain and alpha-internexin."[51] The Examining
Attorney characterizes this dual use as "at best, author confusion whether the term
NF-LIGHT is generic or a source identifier."[52]

In another article, Dr. Kuhle explains that although "[u]ntil recently Nf studies
were limited to CSF, because detection systems were not sensitive enough to
quantitate the physiologically lower levels of Nf in the peripheral … [t]his has
changed with the introduction of the single molecule array (Simoa) technology, which
provides now the analytical basis for highly sensitive quantitation of the **Nf light**
(NfL) subunit in the peripheral blood." This statement is clearly in conflict with
Kuhle's separate treatment of the term as a mark in his declaration.

### 5. "Mixed Record"

Finally, Applicant argues that "[t]he evidence submitted by the Examining
Attorney is insufficient to support a genericness refusal" because "Applicant has
provided the USPTO with least **23** pieces of evidence of third parties clearly
referencing NF-LIGHT in connection with the products provided by Applicant."[53]
Citing *Merrill Lynch*, 4 USPQ2d 1141, Applicant argues that "[t]he Federal Circuit

---

[51] January 18, 2022 Reconsideration Letter, pp. 29-31.

[52] 14 TTABVUE 13 (Examining Attorney's Brief, emphasis added).

[53] 12 TTABVUE 10-11 (Applicant's Brief).

has held that the [USPTO] failed to meet its burden of showing a proposed mark is generic in cases where there is a 'mixed record' of usage."[54]

Despite Applicant's argument to the contrary, this is not a "mixed record" case that compels a finding of non-genericness. "[T]he mere fact that a record includes evidence of both proper trademark use and generic use does not necessarily create a mixed record that would overcome an examining attorney's evidence of genericness." *In re Am. Online, Inc.*, 77 USPQ2d 1618, 1623 (TTAB 2006). Where the record shows a "mixture" of uses, our task remains the same: to determine whether a preponderance of the evidence shows that the proposed mark's "primary significance" to the relevant consuming public is to refer to the product or to indicate source. 15 U.S.C. § 1064(3); *see also Royal Crown*, 127 USPQ2d at 1046 ("The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question.") (quoting *Marvin Ginn*, 228 USPQ at 530). Indeed, it would be unusual in cases such as this where an applicant has been using an allegedly generic term for some period of time for there not to be some evidence showing or referring to trademark use. However, in *Merrill Lynch*, "[t]he mixture of usages unearthed by the NEXIS computerized retrieval service [did] not show" that the relevant consumers viewed and used the applicant's mark "as a generic, common descriptive term" for the services to which the applicant "first applied the term" and thus "[did] not clearly

---

[54] *Id.*

place [the applicant's] mark in the category of a generic or common descriptive term," *Merrill Lynch,* 4 USPQ2d 1141. In the case before us, the record does.

The scientific journal articles unearthed in this record show that the term "NF-LIGHT" has been used in the scientific community as an abbreviation for "neurofilament light" in scientific journals since at least as early as 2003, nine years before Applicant claims to have coined the term. Specifically, Dr. John Richert explained in his January 28, 2003 commentary in Neurology ("NF-light: Disease marker or just another antibody in MS") that "[t]he degree of scatter of the data among patients in this study suggests that quantitating CSF NF-Light may not yet be useful in evaluating an individual patient in the clinic."[55] Unlike the situation in *Merrill Lynch*, where "voluminous evidence of usage" by third parties followed the introduction of the applicant Merrill Lynch's services "to designate services such as [the] applicant offers," 4 USPQ2d at 1570, generic use of NF-LIGHT by third-parties in this case was already ongoing when applicant adopted the term for its specimen analysis kits.

The type of generic use that appears in the evidence in this case also distinguishes it from *Merrill Lynch*. Notably, each of the 16 journal articles of record that use the term NF-LIGHT generically—including seven that were authored in part by Dr. Kuhle (Applicant's declaration witness) and two by Mr. Norgren (Applicant's vice president) himself—do so in the course of defining it as one of the four subunits of a neurofilament. Each of these 16 articles explains unequivocally and in a definitional

---

[55] March 27, 2021 Final Office Action, pp. 29-30.

manner, that "neurofilaments," which are abbreviated as "NFs" (or "NF") are comprised of four subunits, one of which is "NF light" (or "NF-light"), and further discussion of that term is then referred to as "NFL" (or "NfL," etc.). To illustrate, we refer once again to the February 7, 2019 article in the Journal of Clinical Laboratory Analysis titled "Neurofilament levels in patients with neurological diseases: A comparison of neurofilament light and heavy chain levels" that was introduced by both Applicant and the Examining Attorney and, like most of the others, uses the term NF-LIGHT just once in the course of identifying a shortened, further abbreviation (e.g., "NfL") that is used to identify that term for the remainder of the article, e.g., "NfL":[56]

> Neurofilaments (NFs) are the main structural proteins of neurons and are members of the class IV intermediate filament protein family. NFs are selectively expressed in the nervous system and are found at the highest levels in long projection axons. They are composed of four subunits, namely **NF light** (NFL), NF medium (NFM), and NF heavy (NFH) chain subunits plus an unstable alpha internexin subunit.[57]

This is quite different from the type of evidence presented in *Merrill Lynch,* which consisted of numerous articles in financial publications not only discussing services similar to those provided by the applicant under its proposed mark [CASH MANAGEMENT ACCOUNT], but also referring to the applicant as a pioneer in providing such services.

In this case, two decades of scientific journals consistently use the term "NF-Light" or "NF Light" as an abbreviation for "neurofilament light," one of the four

---

[56] March 17, 2021 Response to Office Action, pp. 41-48.

[57] *Id.*, p. 41.

subunits of a neurofilament. This is akin to dictionary evidence, and is therefore strong evidence of the relevant public's perception of that term. *See Tea Bd. of India v. Republic of Tea Inc.,* 80 USPQ2d 1881, 1899-1900 (TTAB 2006) ("Dictionary definitions, while not conclusive, reflect the general public's perception of a mark's meaning.") (citing *Pilates Inc. v. Current Concepts Inc.,* 120 F. Supp. 2d 286, 57 USPQ2d 1174 (S.D.N.Y. 2000) and 2 McCarthy on Trademarks and Unfair Competition § 12:13 (5th ed.) ("dictionary definitions are relevant and sometimes persuasive in determining public usage.")).

While Applicant also provided various journal articles showing use of the term NF-LIGHT by third-parties in a manner that acknowledges it as Applicant's trademark (including seven that were authored by Mr. Norgren, Dr. Kuhle, or both) in the course of naming Applicant's ELISA kits,[58] we find that type of use less probative than the usage showing that it is understood as a generic term. This is because the evidence shows that it is an industry practice in scientific journals to identify products that are used in the course of a study using the name for the product applied by the manufacturer. In each of the studies, the author(s) have obtained goods from a manufacturer that are then used in the study, so the authors may be simply

---

[58] *See* "Fingolimod and CSF neurofilament light chain levels in relapsing-remitting multiple sclerosis" (Neurology), January 18, 2022 Request for Reconsideration, pp. 19-28; "Increased neurofilament light chain blood levels in neurodegenerative neurological diseases" (PLOS One journal), *id.,* pp. 29-41; "Neurofilament as Neuronal Injury Blood Marker in Preeclampsia" (Hypertension), *id.,* pp. 69-84); "A comparative study of CSF neurofilament light and heavy chain protein in MS" (Multiple Sclerosis Journal), December 20, 2021 Request for Reconsideration, pp. 42-48; and "A multi-center study of neurofilament assay reliability and inter-laboratory variability" (Amyotrophic lateral Sclerosis and Frontotemporal Degeneration), pp. 50-57; "Neurofilament ELISA validation" (Journal of Immunological Methods), pp. 59-67.

acknowledging whatever name was given by the manufacturer, which in the case of

Applicant is NF-LIGHT. Putting aside Mr. Norgren, the authors in that situation are

virtually impelled to identify the goods as they are named by the manufacturer, which

had just provided its goods for use in the study.

We find that there are essentially three categories of articles:

- Articles, including those written by Mr. Norgren and Dr. Kuhle, which use the term NF-LIGHT generically by identifying "NF light" as one of the four subunits of a neurofilament, regardless of the particular assay used in the study;

- Articles, including those written by Mr. Norgren and Dr. Kuhle, which use the term NF-LIGHT in a trademark sense by mentioning it as part of Applicant's product name, sometimes using the registration symbol (®), after using Applicant's product in the study; and

- Articles, including those written by Mr. Norgren and Dr. Kuhle, which use the term NF-LIGHT in both manners.

We further find that the generic use of NF-LIGHT in these articles in the course

of defining the subunits of a neurofilament is strong evidence of the primary

significance of that term to the relevant public, and is not offset by the apparent

ceremonial identification of the term as a trademark whenever Applicant's goods are

used in a study.

Another wrinkle in the evidence is Applicant's use of the registration symbol ("®")

on its website and on specimens of use as shown in the examples below:[59]

---

[59] June 11, 2020 Application, p. 7; September 17, 2020 Office Action, p 14; March 27, 2021 Final Office Action, pp. 9-10.

Serial No. 88960633

NF-light® (Neurofilament light) ELISA                                    ENGLISH

    

Rapid detection of brain disease

**Instructions for Use - NF-light® (Neurofilament light) ELISA**

**1.    Intended use**

NF-light® ELISA is an invitro diagnostic device intended for quantitative determinations of human Neurofilament light (NF-L) protein in cerebrospinal fluid (CSF). The result is used to aid the diagnosis of neurological diseases such as amylotrophic lateral sclerosis (ALS), multiple sclerosis (MS), dementias and Parkinson's disease (PD). The kit is intended for professional use.

In addition, the NF-light® ELISA can be used for research using samples containing NF-L from rat, bovine and macaque sources as the antibodies in the assay recognizes NF-L from these species as well.





Rapid detection of brain disease                    **Instructions for Use**

**NF-light® (Neurofilament light) ELISA**

Enzyme immunoassay for quantitative determination of human Neurofilament light (NF-L protein in cerebrospinal fluid. The antibodies cross-react with Neurofilament light from r bovine and macaque sources and can be used for research on the above species as well



Notably, Applicant is a Swedish company and Sweden, as explained in TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 906.01 (July 2022), is one of several countries other than the United States that also use the ® symbol to indicate that a mark is registered in their country. While the record in this case does not indicate whether or not the same proposed mark is registered by Applicant for the same goods in Sweden, we can infer from Applicant's use of the registration symbol on its website and on its goods and packaging that Applicant intends to communicate to the public not just that Applicant claims the term NF-LIGHT to be its trademark, but that it has actually registered the term as its trademark for the goods at issue. That message is false, at least with respect to the United States. And while there is no evidence in this case that Applicant has misused the registration

symbol,[60] we cannot overlook the likelihood that Applicant's designation of NF-LIGHT as "registered" on its website and on its products had some impact on the authors' treatment of the term when referring to Applicant's goods that were specifically used in the study and obtained from Applicant. This reduces the reliability of such use as an indicator that the relevant public has in fact been educated to view the term as something other than as a generic term for the identified goods.[61]

"Decisions about credibility of witnesses and weight of evidence are committed to the sound discretion of the Board as the trier of fact." *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 1363, 2022 USPQ2d 513, at *11 (Fed. Cir. 2022) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 606 USPQ2d 1, 7 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact.")); *see also M.Z. Berger & Co. v. Swatch AG*, 787 F.3d 1368, 1376-77 (Fed. Cir. 2015) ("Faced with conflicting statements from Berger witnesses about whether the images were created for prosecution or for business reasons evidencing intent, the Board exercised its discretion in crediting the testimony of Mr. Mermelstein, Berger's

---

[60] "When fraudulent misuse of the registration symbol, i.e., use with the intent to deceive the purchasing public or others in the trade into believing that a mark is registered, is conclusively established, the fraud defeats an applicant's right to a registration." *In re Empire Tech. Dev. LLC*, 123 USPQ2d 1544, 1559 n.26 (citing *Copelands' Enters. Inc. v. CNV Inc.*, 945 F.2d 1563, 20 USPQ2d 1295, 1298 (Fed. Cir. 1991), which cites *Johnson Controls, Inc. v. Concorde Battery Corp.*, 228 USPQ 39, 44 (TTAB 1985)). The record in this case is not developed with regard to this issue.

[61] In *Empire Tech. Dev.*, we left "for another day the question of whether an applicant could ever legitimately rely upon evidence involving its misuse of the registration symbol to prove that it has educated the public to view its proposed mark as something other than a generic term." *Empire Tech. Dev.*, 123 USPQ at 1559 n.27.

Rule 30(b)(6) witness, over that of other Berger employees. … We defer to the Board's determination of the weight and credibility of such evidence.") (citation omitted). The Examining Attorney's evidence outweighs Applicant's evidence in credibility and probative value.

We find that the totality of the evidence strongly supports the Examining Attorney's position that clinical and medical researchers primarily understand NF-Light as a generic term referring to "neurofilament light," the target analyte in Applicant's ELISA kit, and is not offset by evidence showing additional use of that term as a trademark when identifying Applicant's goods that were used in the study.

### D. Determination on Genericness

We are convinced on this record that the relevant public perceives NF-LIGHT as substantially synonymous with, and a reference to, neurofilament light, a subcategory and key aspect of Applicant's "specimen analysis kits containing reagents and assays for detecting neurological biomarkers in biological samples, serum, blood, plasma, saliva, and cerebrospinal fluid in human and animal samples used by medical and clinical researchers in labs and institutions." *See Royal Crown,* 127 USPQ2d at 1047 (mark deemed "generic because it refers to a key aspect of at least a sub-group or type of [the genus of] the claimed beverage goods."); *Cordua Rests.,* 118 USPQ2d at 1638 (CHURRASCOS generic for restaurant services where "'churrascos' refers to a key aspect of a class of restaurants because those restaurants are commonly referred to as 'churrasco restaurants.'"). Applicant's proposed mark is therefore generic. *See Cordua Rests.,* 118 USPQ2d at 1637-38; *see also In re Cent.*

*Sprinkler Co.*, 49 USPQ2d 1194, 1199 (TTAB 1998) ("[T]his term is generic and should be freely available for use by competitors.").

## II. Mere Descriptiveness and Lack of Acquired Distinctiveness

For completeness, we also address the Examining Attorney's alternative refusal to register the term NF-LIGHT on the ground that it is merely descriptive of the identified goods under Section 2(e)(1) of the Trademark Act and has not acquired distinctiveness under Section 2(f). A term is merely descriptive under Section 2(e)(1) if it forthwith conveys an immediate idea of an ingredient, quality, characteristic, feature, function, purpose or use of the services. *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); *see also In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987). "[T]o be placed on the principal register, descriptive terms must achieve significance 'in the minds of the public' as identifying the applicant's goods or services—a quality called 'acquired distinctiveness' ...." *Booking.com*, 2020 USPQ2d 10729, at *3 (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065 (2000)).

### A. Mere Descriptiveness Conceded

At the outset, we note that the application was filed with a claim of acquired distinctiveness based on Applicant's purported substantially exclusive and continuous use of the mark in commerce for at least five years. Thus, Applicant concedes that NF-LIGHT is merely descriptive.[62] *See Cold War Museum, Inc. v. Cold*

---

[62] Applicant's argument in its brief, 12 TTABVUE 16-18, that the proposed mark is at most suggestive does not overcome this concession.

*War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("Where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."). "[T]he examining attorney may rely on this concession alone. Once an applicant has claimed that matter has acquired distinctiveness under § 2(f), the issue to be determined is not whether the matter is inherently distinctive but, rather, whether it has acquired distinctiveness." TMEP § 1212.02(b) (citing *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988); *In re Guaranteed Rate, Inc.*, 2020 USPQ2d 10869, at *2 (TTAB 2020); *Spiritline Cruises LLC v. Tour Mgmt. Servs., Inc.*, 2020 USPQ2d 48324, at *5 (TTAB 2020); *In re Hikari Sales USA, Inc.*, 2019 USPQ2d 111514, at *1 (TTAB 2019)).

## B. Degree of Descriptiveness

Despite Applicant's concession that NF-LIGHT is merely descriptive, we must determine its degree of descriptiveness for purposes of determining whether it has acquired distinctiveness. "[A]pplicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *Steelbuilding.com*, 75 USPQ2d at 1424; *see also Royal Crown*, 127 USPQ2d at 1045 (Board should first determine level of descriptiveness of proposed mark before assessing acquired distinctiveness).

Based on the evidence discussed above in connection with the genericness refusal, we find that each of the terms comprising Applicant's proposed mark, "NF" and "LIGHT," individually and when combined as NF LIGHT is at the very least highly

descriptive of a characteristic and feature of Applicant's ELISA kits, namely, the target analyte subunit neurofilament light. *See, e.g.*, *DuoProSS Meditech Corp., v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 103 USPQ2d 1753, 1759 (Fed. Cir. 2012) (finding SNAP SIMPLY SAFER merely descriptive for cannulae, needles, and syringes); *Remington Prods.*, 13 USPQ2d at 1448 ("travel care" is merely descriptive in light of, among other evidence, advertisements using the term descriptively); *In re Positec Grp. Ltd.*, 108 USPQ2d 1161, 1173 (TTAB 2013) (holding SUPERJAWS merely descriptive for tools). Accordingly, the term NF-LIGHT is highly descriptive of Applicant's goods under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1).

## C. Evidence of Acquired Distinctiveness

Applicant bears the ultimate burden of providing acquired distinctiveness of its proposed mark NF-LIGHT by a preponderance of evidence, *Yamaha Int'l Corp.*, 6 USPQ2d at 1005-06. Because we have found that the term NF-LIGHT is highly descriptive of Applicant's goods, Applicant's burden of establishing acquired distinctiveness under Section 2(f) is commensurately high. *See Steelbuilding.com*, 75 USPQ2d at 1424; *In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990); *In re Greenliant Sys. Ltd.*, 97 USPQ2d 1078, 1085 (TTAB 2010).

Inasmuch as Applicant's Section 2(f) claim rests on prior use and "[o]ther evidence," *see* Trademark Rule 2.41(a)(2)-(3), 37 C.F.R. § 2.41(a)(2)-(3), we look to the following six factors that inform whether a mark has acquired secondary meaning: (1) association of the trademark with a particular source by actual purchasers (typically measured by consumer surveys); (2) length, degree, and exclusivity of use;

(3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark. *Converse, Inc. v. Int'l Trade Comm'n*, 907 F.3d 1361, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018), cited in *Flame & Wax, Inc. v. Laguna Candles, LLC*, 2022 USPQ2d 714, at *26 (TTAB 2022). All six factors are to be weighed together in determining the existence of secondary meaning. *Id*. Applicant submitted evidence for factors one and two only.

We discount the probative value of the scientific journal evidence Applicant submitted in support of the first factor – association of the mark with a particular source by actual purchasers – for the same reasons mentioned in our discussion of the genericness refusal: we find it unreliable. As noted, NF-LIGHT is only referred to as a trademark when naming Applicant's goods that were used in the study discussed in the article. Some of the same articles that use NF-LIGHT, however, including those written by Dr. Kuhle and Mr. Norgren, also use the term generically by identifying it as an abbreviation for "neurofilament light," one of the four subunits of a neurofilament. Other articles, including those written by Dr. Kuhle and Mr. Norgren, whose authors did not use Applicant's goods in the study, use the term in a generic sense only. In short, Applicant's evidence does not offset the bulk of the evidence showing routine generic use of NF-LIGHT to refer to the target analyte of Applicant's goods.

Applicant's evidence regarding the second factor, that is the length, degree, and exclusivity of use, is composed of (1) Applicant's Section 2(f) Declaration Claim of

Acquired Distinctiveness based on substantially exclusive and continuous use of NF-LIGHT for at least the five years immediately preceding the filing of the application, signed by Applicant's vice president and managing director, Niklas Norgren, and (2) Mr. Norgren's second declaration during prosecution that Applicant has made substantially exclusive and continue use of NF-LIGHT in connection with the identified goods since at least as early as November 13, 2012.

While "it is true that evidence of substantially exclusive use for a period of five years immediately preceding the filing of an application may be considered prima facie evidence of acquired distinctiveness" under Section 2(f), *In re Ennco Display Sys., Inc.*, 56 USPQ2d 1279, 1286 (TTAB 2008), the "language of the statute is permissive, and the weight to be accorded this kind of evidence depends on the facts and circumstances of the particular case." *Id.* (citing *Yamaha Int'l Corp.*, 6 USPQ2d at 1004. We have discretion to find that evidence of a period of use is insufficient to show acquired distinctiveness, and we do so here because of the highly descriptive nature of Applicant's proposed mark. *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 128 USPQ2d 1370, 1378 (Fed. Cir. 2018) ("[W]hile evidence of substantially exclusive and continuous use may be sufficient to prove a prima facie case of acquired distinctiveness, that is not always the case."); *La. Fish Fry Prods.*, 116 USPQ2d at 1265; *see also In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) (affirming USPTO's decision to require more than an affidavit of eight years of continuous and substantially exclusive use); *In re Kalmbach Publ'g Co.*, 14 USPQ2d 1490, 1492 (TTAB 1989) (deeming a Section 2(f) claim of more than 10

years of use insufficient for a highly descriptive mark "without specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers' perception of the asserted mark"); *In re Synergistics Research Corp.*, 218 USPQ 165, 167 (TTAB 1983) ("[W]e have consistently held that a declaration or affidavit of continuous and exclusive use as a mark for an extended period of years is insufficient in and of itself to support registrability under Section 2(f) of the Trademark Act where the term sought to be registered is highly descriptive in character."). Moreover, the record shows that Applicant's use of the terminology in its mark has not been substantially exclusive in the relevant industry. *See Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984); *see also Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1682 (TTAB 2007).

Considering the evidence of acquired distinctiveness as a whole and weighing it together, we find that Applicant has failed to meet its burden to show that consumers would recognize the proposed highly descriptive mark as a source indicator.

## III. Applicant's Alternative Request to Amend the Application to the Supplemental Register

"Matter which is unregistrable on the Supplemental Register includes generic or common descriptive terms and designations that are so highly descriptive of the goods or services that they are devoid of the capacity of denoting origin in any one entity." *In re Harcourt Brace Jovanovich, Inc.*, 222 USPQ 820, 821 (TTAB 1984). Given our finding that NF-LIGHT is generic for the identified goods, Applicant's alternative request to amend the application to seek registration on the Supplemental Register is denied. *See In re Helena Rubinstein*, Inc., 410 F.2d 438, 161 USPQ 606 (CCPA 1969)

("PASTEURIZED" and "PASTEURIZED" FACE CREAM SPECIAL for face cream held so highly descriptive of applicant's goods as to be incapable of registration on the Supplemental Register).

*Decision***:** The refusal to register NF-LIGHT for the identified goods on the ground that it is generic is affirmed. The alternative refusal to register NF-LIGHT on the ground that it is merely descriptive under Section 2(e)(1) of the Trademark Act and has not acquired distinctiveness is also affirmed.